Prisoner's Name:     Derek Don Posey
Prisoner's DOC No:    842726
Place of Confinement:   Oklahoma State Penitentiary
            McAlester, Oklahoma

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

DEREK DON POSEY,     )
            )
  Petitioner,      )
            )
v.           )  Case No. CIV-25-128-PRW
            )
CHRISTE QUICK, Warden,   )
Oklahoma State Penitentiary,   )  CAPITAL CASE
            )
  Respondent.     )

---

## PETITION FOR A WRIT OF
## HABEAS CORPUS BY A PERSON IN CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

---

HUNTER LABOVITZ, NJ BAR #010942006
BRENDAN VAN WINKLE, SC BAR #104768
Assistant Federal Public Defenders
Federal Public Defender's Office
Western District of Oklahoma
215 Dean A. McGee, Suite 707
Oklahoma City, OK   73102
Telephone: (405) 609-5975
Facsimile: (405) 609-5976
Hunter_Labovitz@fd.org
Brendan_VanWinkle@fd.org

COUNSEL FOR PETITIONER,
DEREK DON POSEY

January 26, 2026

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ......................................................................... vi

ATTACHMENT LIST .................................................................................. xii

PROCEDURAL HISTORY ........................................................................... xi

STATEMENT OF THE CASE ....................................................................... 1

STATEMENT OF FACTS ............................................................................. 1

STATEMENT REGARDING STANDARD OF REVIEW ............................ 5

STATEMENT REGARDING PROCEDURAL DEFENSES .......................... 5

GROUND I ................................................................................................... 6

THE ADMISSION OF BURGLARY AND SEXUAL ASSAULT ALLEGATIONS FOR WHICH POSEY WAS ACQUITTED IN A PRIOR TRIAL VIOLATED THE FIFTH AMENDMENT PROHIBITION ON DOUBLE JEOPARDY.

A. Issue-Preclusion Analysis Under the Double Jeopardy Clause ......................... 6

B. Double Jeopardy Barred the Admission of the Acquitted Allegations .............. 7

C. OCCA's Resolution of this Claim Does Not Preclude Merits Review Under § 2254(d) ............................................................................ 14

1. OCCA was Unreasonable Under 28 U.S.C. § 2254(d)(1) .................... 14
2. OCCA was Unreasonable Under 28 U.S.C. § 2254(d)(2) .................... 18

GROUND II ................................................................................................ 23

THE DISTRICT COURT VIOLATED POSEY'S RIGHT TO AN IMPARTIAL JURY BY IMPROPERLY STRIKING THREE PANELISTS FOR CAUSE.

A. Legal Standard ................................................................................... 23

B. Improper For-Cause Strikes in Posey's Case ................................... 24

    1. Prospective Juror Sharon Young ................................. 24
    2. Prospective Juror Carolyn Bish ................................. 28
    3. Prospective Juror Crystal Howard ............................. 30

C. OCCA's Resolution of This Claim Does Not Preclude Merits Review Under § 2254(d) ........................................................................ 32

    1. OCCA Unreasonably Applied *Witt* Under § 2254(d)(1) ...................... 32
    2. OCCA Unreasonably Determined the Facts Under § 2254(d)(2) ......... 32

GROUND III .................................................................................. 34

THE STATE VIOLATED THE FOURTEENTH AMENDMENT BY USING RACE TO SELECT THE JURY.

A. Legal Standard ..................................................................... 34

B. The *Batson* Violation at Posey's Trial ........................................ 36

    1. The State's Emphasis on Wright's Career was Pretextual ................... 37
    2. The State's Statement that Wright Had Sentencing Knowledge was Purely Afterthought ............................................. 40
    3. The State's Argument that Wright Would not be Impartial is Refuted by the Record .............................................. 40
    4. The State Mischaracterized Wright's Opinions on the Death Penalty .. 43
    5. Comparison Evidence Shows the State was Unconcerned with Other Panelists who had Relatives Connected to Crime ................ 44
    6. Each of the State's Race-Neutral Reasons Were Pretextual ................. 46

C. OCCA's Resolution of This Claim Does Not Preclude Merits Review Under § 2254(d) ................................................................... 47

    1. OCCA Unreasonable Applied *Batson* Under 28 U.S.C. § 2254(d)(1) .. 47
    2. OCCA Unreasonably Determined the Facts Under § 2254(d)(2) ......... 48

GROUND IV ........................................................................... 50

THE TRIAL VIOLATED POSEY'S RIGHT TO DUE PROCESS AND A
FAIR TRIAL BECAUSE JURORS OVERHEARD PREJUDICIAL AND
INADMISSIBLE INFORMATION DURING BENCH CONFERENCES.

A. Legal Standard ................................................................ 50

B. Violation at Posey's Trial ................................................ 51

GROUND V ........................................................................... 53

POSEY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL
IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

A. Legal Standard ................................................................ 53

B. Counsel Failed to Request a Stage 1 Voluntary Intoxication Instruction ........ 53

    1. Introduction ................................................................ 53
    2. Counsel's Deficient Performance ......................................... 55
    3. The Deficient Performance Prejudiced Posey in Stage 1 ...................... 57

C. All Prior Counsel Failed to Ensure that the State Court Record Completely
And Accurately Represented the Facts Surrounding Posey's Acquitted Tulsa
Accusations the State Relied on in Stage 1 ........................................... 58

    1. Deficient performance ..................................................... 58
    2. Prejudice ................................................................. 59

D. Counsel Failed to Adequately Investigate for, Prepare for, and Effectively
Litigate at the Sentencing Stage .................................................... 59

    1. Counsel Failed to Present a Trauma Expert at Stage 2 ...................... 59

        a. Introduction ........................................................ 59
        b. Counsel performed deficiently ...................................... 60
        c. Counsel's performance prejudiced Posey ............................. 63
        d. OCCA's Resolution of this Claim Does Not Preclude
        Merits Review Under 28 U.S.C. § 2254(d) ............................. 68

iii

2. Counsel Failed to Present Evidence that Posey is Brain Damaged ....... 74

    a. Trial Counsel's Deficient Performance ...................................... 74
    b. Trial Counsel's Deficient Performance Prejudiced Posey ......... 76

3. Counsel Failed to Argue Posey's Intoxication as Mitigation ............... 81

4. Counsel Failed to Present Available Witnesses on Future Conduct ..... 81

5. Counsel Failed to Fully Investigate and Rebut the State's Assertions In Support of the Continuing Threat Aggravator ....................................... 82

6. Cumulatively, Counsel's Failures Prejudiced Posey ............................. 82

E. Prior Counsel Ineffectively Omitted These Ineffectiveness Grounds .............. 83

GROUND VI .................................................................................................... 84

THE STATE'S USE OF A VISIBLE SHOCK COLLAR ON POSEY VIOLATED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS.

A. Legal Standard .................................................................................. 84

B. The Use of a Visible Shock Collar was Unconstitutional ................................ 85

GROUND VII ................................................................................................... 87

THE TRIAL COURT'S REFUSAL TO PERMIT POSEY THE OPPORTUNITY TO PRESENT TESTIMONY CRITICAL TO HIS DEFENSE VIOLATED HIS RIGHTS TO DUE PROCESS OF LAW, TO A FAIR TRIAL AND RELIABLE SENTENCING PROCEEDING, AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

A. Legal Argument ................................................................................ 87

B. The Trial Court Impermissibly Excluded Third-Party Perpetrator Evidence .. 89

1. The Trial Court Impermissibly Excluded Evidence Impeaching Ms. Gibbins's Ex-Boyfriend Brady Almaguer .............................. 89
2. The Trial Court Impermissibly Excluded All Evidence of Other Third-Party Perpetrators ................................................................. 93

C. The Trial Court Impermissibly Prohibited the Defense from Showing That the State's Fire Origin Theory was Scientifically Unreliable ...................95

GROUND VIII ................................................................................................97

THE DISPLAY OF VICTIMS' BUTTONS BY SPECTATORS IN THE COURTROOM VIOLATED POSEY'S CONSTITUTIONAL RIGHTS.

A. Legal Standard ....................................................................................97

B. The Presence of Spectators Wearing Buttons in the Courtroom at Trial Displaying the Victims' Images Violated Posey's Constitutional Rights ............97

CONCLUSION....................................................................................................100

CERTIFICATE OF SERVICE ...........................................................................101

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Adams v. Texas*, 448 U.S. 38 (1980) ........................................................................*passim*

*Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 569 U.S. 641 (2013) ..... 100

*Ashe v. Swenson*, 397 U.S. 436 (1970) ...................................................................*passim*

*Batson v. Kentucky*, 476 U.S. 79 (1986) .................................................................*passim*

*Beck v. Alabama*, 447 U.S. 625 (1980) ............................................................................ 57

*Bravo-Fernandez v. United States*, 580 U.S. 5 (2016) ................................................... 12

*Brumfield v. Cain*, 576 U.S. 305 (2015) ...................................................................... 5, 9

*California v. Trombetta*, 467 U.S. 479 (1984) ............................................................... 88

*Carey v. Musladin*, 549 U.S. 70 (2006) ...........................................................97, 99, 100

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ......................................................*passim*

*Crane v. Kentucky*, 476 U.S. 683 (1986) ....................................................................... 88

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ...................................................................... 9

*Davis v. Alaska*, 415 U.S. 308 (1974) ........................................................................... 88

*Deck v. Missouri*, 544 U.S. 622 (2005) .............................................................85, 86, 87

*Dowling v. United States*, 493 U.S. 342 (1990) ......................................................*passim*

*Estelle v. Williams*, 425 U.S. 501 (1976) ................................................................. 84, 97

*Estes v. Texas*, 381 U.S. 532 (1965) .......................................................................... 50, 53

*Evitts v. Lucey*, 469 U.S. 387 (1985) ............................................................................. 83

*Flowers v. Mississippi*, 588 U.S. 284 (2019) ..........................................................*passim*

*Foster v. Chatman*, 578 U.S. 488 (2016)  ....................................................... 34, 35, 42, 43

*Geders v. United States*, 425 U.S. 80 (1976)  ................................................... 88

*Gray v. Mississippi*, 481 U.S. 648 (1987)  ....................................................... 23, 26, 27, 29

*Hernandez v. New York*, 500 U.S. 352 (1991)  ................................................. 47

*Herring v. New York*, 422 U.S. 853 (1975)  ..................................................... 88

*Holbrook v. Flynn*, 475 U.S. 560 (1986)  ........................................................ 84, 85, 97, 99

*Holmes v. South Carolina*, 547 U.S. 319 (2006)  ............................................. 88, 92

*Irvin v. Dowd*, 366 U.S. 717 (1961)  ................................................................ 50

*Johnson v. California*, 545 U.S. 162 (2005)  .................................................... 35

*Johnson v. Mississippi*, 486 U.S. 578 (1988)  .................................................. 14

*Lockett v. Ohio*, 438 U.S. 586 (1978)  ............................................................. 60, 71

*Lockhart v. McCree*, 476 U.S. 162 (1986)  ...................................................... 24, 25, 96

*Marshall v. United States¸* 360 U.S. 310 (1959)  ............................................. 50

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) (*Miller-El I*) ............................................ *passim*

*Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*) ............................................ *passim*

*Penry v. Lynaugh*, 492 U.S. 302 (1989)  .......................................................... 63

*Porter v. McCollum¸* 558 U.S. 30 (2009)  ........................................................ *passim*

*Purkett v. Elem*, 514 U.S. 765 (1995)  ............................................................. 36, 47, 48

*Remmer v. United States*, 347 U.S. 227 (1954)  ............................................... 50

*Rock v. Arkansas*, 482 U.S. 44 (1987)  ............................................................ 93

*Rompilla v. Beard¸* 545 U.S. 374 (2005)  ........................................................ *passim*

*Sears v. Upton*, 561 U.S. 945 (2010) ............................................................ 60, 69, 74, 77

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ................................................. 82

*Smith v. Robbins*, 528 U.S. 259 (2000) .......................................................... 83

*Snyder v. Louisiana*, 552 U.S. 472 (2008) ...................................................... 34, 35

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................*passim*

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ....................................................... 97

*United States v. Cronic*, 466 U.S. 648 (1984) ................................................ 88

*Wainwright v. Witt*, 469 U.S. 412 (1985) ....................................................... 24

*Washington v. Davis*, 426 U.S. 229 (1976) ..................................................... 35

*Washington v. Texas*, 388 U.S. 14 (1967) ....................................................... 88

*Wiggins v. Smith*, 539 U.S. 510 (2003) ..........................................................*passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................*passim*

*In re Winship*, 397 U.S. 358 (1970) ................................................................ 96

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ................................................. 23, 24, 25,

*Yeager v. United States*, 557 U.S. 110 (2009) ................................................ 6, 8

## FEDERAL CIRCUIT COURT CASES

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) ..................................*passim*

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ......................................... 83

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ..................................... 76, 78, 83

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ................................. 62, 76, 78, 80

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000) ......................................... 60

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001) ............................................................. 83

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ........................................................ *passim*

*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009) ........................................................ 57

*United States v. Banegas*, 600 F.3d 342 (5th Cir. 2010) ............................................. 86, 87

### STATE COURT CASES

*Coddington v. State*, 142 P.3d 437 (Okla. Crim. App. 2006) ..................................... 56, 57

*Grissom v. State*, 253 P.3d 969 (Okla. Crim. App. 2011) ............................. 54, 55, 57, 58

*Jones v. State*, 781 P.2d 326 (Okla. Crim. App. 1989) ..................................................... 92

*Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007) ............................................ 55, 57

*Oxendine v. State*, 335 P.2d 940 (Okla. Crim. App. 1958) ............................................. 58

*Perryman v. State*, 159 P. 937 (Okla. Crim. App. 1916) ................................................. 55

*Posey v. State*, 548 P.3d 1245 (Okla. Crim. App. 2024) ........................................ *passim*

### FEDERAL STATUTES

28 U.S.C. § 2243 ................................................................................................................ 6

28 U.S.C. § 2254 ....................................................................................................... *passim*

### STATE STATUTES

12 O.S. 1981 § 2608(B) ................................................................................................... 92

21 O.S. § 142A-10 ..................................................................................................... 97, 100

# OTHER AUTHORITIES

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,
Guideline 10.11(F) (2003) ..................................................................... 61

Garvey, Stephen P., *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*,
98 Colum. L.Rev. 1538 (Oct. 1998) .................................................... 96

Stetler, Russell., *Mental Health Evidence and the Capital Defense Function: Prevailing
Norms*, 82 UMKC L. Rev. 407 (2014) ........................................... 61, 73

## **RECORD REFERENCES**

Record references to transcripts, records, and exhibits will be designated as follows:

Dkt. 19-X     Trial Proceeding Transcripts, followed by the relevant page number, based on the page numbering in the CM/ECF header pagination in the attachments to Doc. 19 in *Posey v. Quick*, CIV-25-128-PRW (W.D. Okla.)

Dkt. 20-X     Nineteen-volume consecutively paginated Original Record in *State v. Posey*, Case No. CF-2013-463 (Dist. Ct. Canadian Cty.), Case No. D-2019-542 (Okla. Ct. Crim. App.), followed by the relevant page number, based on the page numbering in the CM/ECF header pagination in the attachments to Doc. 20 in *Posey v. Quick*, CIV-25-128-PRW (W.D. Okla.)

Att.X         Exhibits attached to the Habeas Petition followed by the attachment number.

**ATTACHMENT LIST**

| | |
|---|---|
| Attachment 1 | Opinion of the Oklahoma Court of Criminal Appeals on APCR, *Posey v. State*, Case No. PCD-2019-609 (Okla. Crim. App. June 27, 2024) |
| Attachment 2 | Affidavit of Edward Lindsey, Esq., Dec. 12, 2025 |
| Attachment 3 | Motion Hearing Transcript, *State v. Posey*, CF-2008-6282 (Tulsa Cnty. Dist. Ct. Oct. 22, 2010) |
| Attachment 4 | Affidavit of Kim A. Marks (Jan. 12, 2026) |
| Attachment 5 | Juror Information Sheet for Steven Wesley Been, *State v. Posey*, CF-2013-463 (Canadian Cnty. Dist. Ct. Dec. 12, 2018) |
| Attachment 6 | Oklahoma State Bureau of Investigation Interview Report 2013-787/46 (July 12, 2013) |
| Attachment 7 | Affidavit of Mitchell Solomon, Jan. 22, 2026 |
| Attachment 8 | Report of Craig W. Stevens, Ph.D., Jan. 23, 2026 |
| Attachment 9 | Affidavit of Rahn Yukio Minagawa, Ph.D., Oct. 1, 2021 |
| Attachment 10 | Report and CV of Katherine Porterfield, Ph.D., Jan. 22, 2026 |
| Attachment 11 | Report and CV of Martin H. Teicher, M.D. Ph.D., Jan. 21, 2026 |
| Attachment 12 | Declaration of David Gepner, Jan. 22, 2026 |
| Attachment 13 | Affidavit of Kaetee Bruns, Dec. 17, 2025 |
| Attachment 14 | Affidavit of Marc Gouldsby, Jan. 7, 2026 |
| Attachment 15 | Declaration of Jessica Stallsworth, Jan. 13, 2026 |
| Attachment 16 | Affidavit of Shannon Mendenhall, Nov. 18, 2025 |
| Attachment 17 | Report and CV of Scott J. Hunter, Ph.D., Jan. 20, 2026 |

# PROCEDURAL HISTORY
## PURSUANT TO GENERAL INSTRUCTIONS
### FOR HABEAS CORPUS ACTIONS UNDER 28 U.S.C. §§ 2241 AND 2254

### A.    State Court Conviction and Sentence

Court:       District Court of Canadian County, State of Oklahoma
Case No.:    CF-2013-463
Charges:     First-Degree Murder (Okla. Stat. tit. 21, §701.7). Offense date: 6-13-2013.
Plea:        Not guilty. Defendant did not testify.
Trial:       Jury trial held March 18, 2019, to June 6, 2019.
Result:      Guilty verdict, June 6, 2019; Death sentence July 22, 2019.
Judge:       Canadian County Judge Bob W. Hughey.
Counsel:     Mitchell Solomon, Shea Smith, Benjamin Brown, and Raven Sealy, Capital Counsel, Oklahoma Indigent Defense System, P.O. Box 926, Norman, OK 73070-0926.

### B.    State Court Direct Appeal

Court:       Oklahoma Court of Criminal Appeals (OCCA).
Case No.:    D-2019-542   No evidentiary hearing was requested or ordered.
Opinion:     *Posey v. State*, 548 P.3d 1245 (2024)
Result:      Conviction and death sentence affirmed April 18, 2024.
Certiorari:  *Posey v. Oklahoma*, 145 S. Ct. 1142 (2025) (*cert. denied*)
Counsel:     Michael Morehead, Alex Richard, Jamie D. Pybas, Homicide Direct Appeals Division, Oklahoma Indigent Defense System, PO Box 926, Norman, OK 73070-0926

### C.    State Court Application for Post-Conviction Relief:

Court:       Oklahoma Court of Criminal Appeals (OCCA)
Case No.:    PCD-2019-609 No evidentiary hearing received.
Opinion:     Denied, *Posey v. State,* Case No. PCD-2019-609, slip op. (Okla. Crim. App. June 27, 2024) (attached hereto as Att. 1.)
Counsel:     Wyndi Thomas Hobbs, Taylor L. Ledford, Capital Post-Conviction Division, Oklahoma Indigent Defense System, P.O. Box 926, Norman, OK 73070.

## STATEMENT OF THE CASE

Derek Posey was charged in an Amended Information in Canadian County District Court, Case No. CF-2013-463, on February 6, 2014, with both first-degree murder and felony murder in the June 16, 2013, deaths of Amy and Bryor Gibbins, and debit card theft. Dkt. 20-1 at 51, 213-16. The State sought the death penalty, alleging three aggravating circumstances. Dkt. 20-1 at 64; Dkt. 20-3 at 339-47. At his 2019 trial, the jury found Posey guilty of both murders, without specifying under which theory, and debit card theft, Dkt. 20-3 at 786-88. The jury voted for a death sentence. Dkt. 20-3 at 890-94. On July 22, 2019, the trial court formally sentenced Posey to death. Dkt. 19-15 at 776; Dkt. 20-3 at 943-46. The Oklahoma Court of Criminal Appeals (OCCA) affirmed Posey's convictions and sentences on direct appeal. *Posey v. State*, 548 P.3d 1245 (Okla. Crim. App. 2024). Posey filed his Application for Post-Conviction Relief in PCD-19-609, which OCCA denied in an unpublished opinion on June 27, 2024. *See* Att. 1.

## STATEMENT OF FACTS

On June 16, 2013, around 4:50 a.m., firefighters and law enforcement arrived at a house fire in Calumet, Oklahoma. Dkt. 19-8 at 107. After extinguishing the fire, firefighters found the remains of Amy Gibbins and her son Bryor inside the home. Initially, the fire was suspected to have resulted from a faulty air conditioner in the bedroom where Ms. Gibbins' body was found. Dkt. 19-8 at 166-67.

Upon further investigation, Posey was identified as being on video using Ms. Gibbins's ATM card after her death. Police arrested Posey on outstanding traffic tickets. Dkt. 19-10 at 574. During his interrogation, Posey admitted he was the person in the ATM

1

video, but denied any relationship with Ms. Gibbins, and claimed he had never been inside her house. Dkt. 19-10 at 557, 571-72.

At trial, Posey's co-worker Joshua Tilley testified that on June 15, 2013, he and Posey went out drinking from 7:00 p.m. to around 1:45 a.m. on the 16th. Dkt. 19-10 at 391-95, 418-19. All told, Posey consumed about 24 standard alcoholic drinks, including beer and liquor, during the seven-hour timeframe. When Posey and Tilley got back to their work bunkhouse, a neighbor saw Posey stumble inside, and sometime later stumble out. *Id.* at 441-42. Another coworker testified that Posey looked hungover when he was getting dressed for work around 5:30 a.m. on June 16, 2013. Dkt 19-11 at 70.

The State conducted Y-STR DNA testing, which identifies only male markers, on a vaginal swab taken from Ms. Gibbins' body. Dkt. 19-13 at 255. Though Posey was excluded by traditional DNA comparison, a prosecution witness asserted that the profile developed matched the Y-STR profile for Posey and his male paternal relatives. *Id.* at 257. Trial counsel did not present expert testimony to undermine this assertion. Over trial counsel's repeated objections, the State presented nearly two days of testimony and evidence alleging that Posey had raped a woman at night years earlier in Tulsa. Dkt. 19-11 at 113-66, 173-275, 282-331. There, a jury acquitted Posey of burglary and sexual assault; the trial court—upon defense motion and argument based on double jeopardy and collateral estoppel principles—dismissed a rape count with prejudice following a hung jury. Dkt. 19-2 at 123. The State relied heavily on the acquitted Tulsa allegations to assert that Posey similarly broke into Ms. Gibbins' house at night with the intent to commit a sexual assault inside. Dkt. 19-14 at 159, 227-28, 238. Particularly, the State argued that Posey's experience with

2

the Tulsa trial motivated him to kill Ms. Gibbins so that he would not have to stand trial again: "if he left her alive, he wouldn't want t[o] go through the hassle of going to court on this. So[,] he stepped up his game and burned down the house." Dkt. 19-14 at 238.

Throughout trial, the jury was exposed to additional prejudicial, irrelevant, and inadmissible information: the trial court denied a defense request to screen the jury from seeing the shock collar kept on Posey's leg throughout trial, Dkt. 19-4 at 3-6, 23-24; denied the defense request to install a white noise machine to prevent the jury from overhearing extra-record information during sidebar discussions, Dkt. 20-1 at 538-39; and, at the State's urging and over a defense objection, allowed numerous members of the victim's family to sit near the jury in the courtroom wearing grief buttons that pictured Amy and Bryor Gibbins. Dkt. 19-1 at 8-9; Dkt. 19-7 at 6-10, 280; Dkt. 20-1 at 554-56, 562, 997.

Defense fire expert Douglas Carpenter disagreed with the State's evidence regarding the origin of the fire and was critical of the tests performed by a State witness to try to show the origin, finding them to be "unreliable applications of the scientific method." Dkt. 19-13 at 446. Even though the State's fire origin theory was incorrect, the court denied the defense from having Carpenter show the jury video experiments proving that. Dkt. 19-11 at 630.

Posey also presented evidence that Ms. Gibbins' former boyfriend, Brady Almaguer, was the likely killer. Although Almaguer denied ever making any threats toward Ms. Gibbins, the breakup was difficult for Almaguer. Dkt. 19-13 at 42, 56. And Lindsey Kennedy testified that, about a month before the fire, Almaguer threatened to burn down Ms. Gibbins' house with everyone in it. Dkt. 19-13 at 98. Meghan Smith acknowledged that she told investigators that Ms. Gibbins showed her a text in which Almaguer said he wished

3

Amy and Bryor Gibbins would die. Dkt. 19-13 at 768-70. Still, the trial court denied the defense request to call impeachment witnesses, as well as present other evidence, to show that someone other than Posey had motive, means, and opportunity to murder Ms. Gibbins and her son. *See* Dkt. 19-2 at 441-52; Dkt. 19-7 at 123-26, 133-34; Dkt. 19-13 at 737-41, 745, 757; Dkt. 20-2 at 1387-88, Dkt. 20-3 at 18-27. And, post-trial, one of the Assistant District Attorneys who prosecuted Mr. Posey notified Posey's appellate counsel that Almaguer was being investigated for threatening to kill a woman named Elizabeth Whorton. Dkt. 20-5 at 448-59. The ADA believed that Almaguer may have been referring to the murders of Amy and Bryor Gibbins in the following threatening text he sent Wharton:

> U wanted to drive me bk to my old crazy self welp u did it so congrats on being my second murder lmao first one had a kid involved in it n I got away wit now to see how I get away w ur murder.

*Id.* at 457.

During the sentencing stage, the State relied heavily on the continuing threat aggravator, incorporating the acquitted Tulsa conduct and then presenting witnesses who alleged actions by Posey against them. Dkt. 19-14 at 291-379, 434-612. The defense presented lay witnesses who described Posey's childhood as one filled with abuse, neglect, and deprivation. Dkt. 19-15 at 34-225. Other witnesses, including family friends, girlfriends, classmates, and neighbors, testified to Posey being an "all around good and respectful human being." *Posey v. State*, 548 P.3d 1245, 1262 (Okla. Crim. App. 2024); Dkt. 19-15 at 226-612. The defense did not present any expert witnesses in the sentencing stage. Additional facts will be presented as they relate to Posey's claims.

## STATEMENT REGARDING STANDARD OF REVIEW

A state court's denial of relief is not entitled to deference under 28 U.S.C. § 2254(d) if the state court's ruling (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Under § 2254(d)(1), a state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, (2000). Section 2254(d)(2) is satisfied if the petitioner can show that the state courts plainly misapprehended or misstated the record in making their findings, and the misapprehension goes to a material factual issue that is central to a petitioner's claim. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). Further, if the state court ignored or disregarded information highly salient to petitioner's claim that was before the court, then the state court fact-finding is unreasonable. *See Miller–El I*, 537 U.S. at 346. Importantly, for both the (d)(1) and (d)(2) analysis, "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*)).

## STATEMENT REGARDING PROCEDURAL DEFENSES

Federal habeas petitioners are generally required to exhaust state court remedies to obtain relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A). Posey submits that each of his claims is exhausted, will be exhausted, or falls within the exceptions to the exhaustion

5

requirement as permitted by law. As non-exhaustion and procedural default are defenses subject to waiver and forfeiture rules, Posey reserves his right to respond to any arguments the Respondent may assert. *See* 28 U.S.C. § 2243; Rule 5(e), Rules Governing Section 2254 Cases in the United States District Courts.

## GROUNDS FOR HABEAS RELIEF

**I.   THE ADMISSION OF BURGLARY AND SEXUAL ASSAULT ALLEGATIONS FOR WHICH POSEY WAS ACQUITTED IN A PRIOR TRIAL VIOLATED THE FIFTH AMENDMENT PROHIBITION ON DOUBLE JEOPARDY.[1]**

### A.   Issue-Preclusion Analysis Under the Double Jeopardy Clause

The Double Jeopardy Clause ensures the issue-preclusive effect of an acquittal. *Ashe v. Swenson*, 397 U.S. 436, 445 (1970); *Yeager v. United States*, 557 U.S. 110 (2009). Consequently, the prosecution is precluded from "relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Yeager,* 557 U.S. at 119. Thus, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe,* 397 U.S. at 443.

To decide what ultimate issue(s) a prior jury necessarily decided, *Ashe* held that courts must "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter," such as the contentions the parties advanced, and—"with an eye to all the circumstances of the proceedings"—ask "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id*. at 444 (internal quotation marks omitted). *Ashe*

---

[1] Posey raised this Ground as Proposition II on direct appeal.

6

admonishes that the appraisal "is not to be applied with [a] hypertechnical and archaic approach[,] . . . but with realism and rationality." *Id.* And this inquiry must be "set in a practical frame" to prevent an acquitted defendant "from having to 'run the gauntlet' a second time." *Id.* at 444, 446 (quotation omitted).

### B.   Double Jeopardy Barred the Admission of the Acquitted Allegations.

In 2010, Posey stood trial in Tulsa County on charges of first-degree burglary, rape by instrumentation, and sexual battery, all involving complainant Mae Kwon Manning. The State's sole theory was that Posey, acting alone, broke into Manning's home with the intent to commit a sexual assault and then did so, all as part of a single, interlaced criminal transaction. The sole defense was misidentification: Posey never denied that the crimes occurred but was emphatic that he never even entered Manning's home and thus was neither the burglar nor the rapist. Dkt. 19-2 at 64 (defense arguing that what the rapist told Manning matches an individual who she knows is not Posey); Dkt. 19-2 at 126 (defense arguing that "Posey has always maintained h[e] was not at her house."); *id.* at 119 (rapist told Manning very specific facts about himself, "all of which matched somebody else"); Dkt. 19-2 at 819-20 (defense arguing that "what [the Tulsa jury] said was [Posey] didn't do burglary in the first degree. And that means that he was never in the house. And if you're never in the house, you can't rape somebody in the house.").

Given those competing scenarios, the only factual issue at trial was the identity of the perpetrator. The jury acquitted Posey of the burglary and sexual battery counts and hung 10-to-2 for acquittal on the rape count. After the court declared a mistrial on the hung count and scheduled re-trial on that count, Posey filed a motion to dismiss the rape charge with

7

prejudice on *Ashe* collateral estoppel grounds. The trial judge granted the motion, and the State did not appeal. Dkt. 19-2 at 123.

Consistent with *Ashe*, the state court record here shows that only a "single rationally conceivable issue" was in dispute at the Tulsa trial: whether Posey was the person who broke into Manning's apartment and then sexually assaulted her. *Ashe*, 397 U.S. at 445. "And the jury by its verdict found that he had not." *Id*. Considering the evidence and argument regarding the Tulsa trial, Posey's acquittals in his Tulsa trial "must have" reflected a jury determination that he neither entered Manning's home nor sexually assaulted her. *Yeager*, 557 U.S. at 116. Simply put, Posey could not be guilty of any sexual assault without also first being guilty of the predicate burglary. Thus, the only logical basis on which a rational jury could have acquitted Posey was that the State failed to show that Posey entered Manning's home.

The Tulsa trial judge found the same. In granting the motion to dismiss, the Tulsa trial judge:

- cited, quoted, and relied exclusively on *Ashe v. Swenson;*
- held that there is no question that the jury "had evidence to conclude that there was a breaking" into Manning's home because there was overwhelming evidence that someone unlawfully entered her home;
- agreed that the only issue in controversy was whether Posey was the person who broke into Manning's home;
- reviewed the trial evidence supporting that Posey was not the perpetrator of the burglary, including that Manning could not identify Posey from a photo array; Manning was equivocal about her identification of Posey at the preliminary hearing even though the lead investigator told her before the hearing that "that the police had in fact apprehended a man named Posey, and that his DNA matched, and that he would be there at the preliminary hearing;" the story the perpetrator told Manning was "so specific and so unique" that it

pointed to another perpetrator; and that Manning was emphatic that the perpetrator had no tattoos even though evidence showed Posey had tattoos since high school; [2]

● held that the "inescapable" conclusion looking at the evidence on identity is that the jury found Posey "not guilty [of burglary] because they believed he was not the person who perpetrated the crime";

● held that a rational jury under the *Ashe* standard "did in fact conclude factually" that Posey was not the perpetrator; and

● because of the jury's necessary factual conclusion on identity on the predicate burglary, *Ashe* precluded retrial on the rape count as a substantive matter and rather required dismissal of the rape count with prejudice.

---

[2] Tulsa trial counsel Edward Lindsey notes additional evidence corroborating that Posey was not the perpetrator, including that: the assailant, who Manning viewed for 2-3 hours, was about 5'11" tall, and weighed about 160-170 pounds while Posey was 6'3" tall and weighed 210 pounds; fingerprints were collected from multiple items and locations in Manning's apartment, including where the assailant had clearly jimmied open a window to break into Manning's home, but none of the fingerprints matched Posey; and after Manning told the police that the perpetrator ejaculated on her bedroom carpet, DNA testing on a carpet fiber taken from Manning's bedroom found an unknown contributor. *See* Edward Lindsey, Esq. Aff. at 2-4, Dec. 12, 2025 (Att. 2).

Consistent with judge's finding that the assailant told Manning a "specific and unique" story, Lindsey also noted that Manning testified that the assailant talked to her throughout the hours long ordeal and shared information about his life, including that he was 35 years old, was an escaped convict from a nearby halfway house, that he been in prison since he was 24 years old, that he was currently serving a sentence for possession of cocaine, and that he had children in Texas. None of this information matched Mr. Posey, who was 23 years old at the time, had no felony record, had never been to prison, and had no children. The life details the assailant shared with Ms. Manning were nearly identical to the profile of an escaped prisoner named Willie Williamson. The State did not present any evidence that Mr. Posey had ever met Mr. Williamson at any point or had somehow acquired highly specific and accurate details about Mr. Williamson. *Id.* at 3.

While review under §2254(d) considers only the state court record before OCCA, the Court may "take new evidence in an evidentiary hearing" when § 2254(d) does not bar relief. *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). Here, § 2254(d) does not bar relief because, as detailed below, OCCA's decision—based solely on the state court record—was unreasonable under both § 2254(d)(1) and (2). *See also Brumfield v. Cain*, 576 U.S. 305, 311 (2015) (approving district court consideration of new evidence not presented in state court because *Pinholster* is not applicable to *de novo* review). Thus, *de novo* review and consideration of new evidence is appropriate for this ground for habeas relief.

Motion Hearing Transcript at 8-12, *State v. Posey*, No. CF-2008-6282 (Tulsa Cnty. Dist. Ct. Oct. 22, 2010) (Att. 3).[3]

The Tulsa jury—as confirmed by the trial judge's dismissal with prejudice—necessarily determined matters of fact in Posey's favor. Under *Ashe* double jeopardy principles, the State was thus precluded as a federal constitutional matter from trying to relitigate facts necessarily found in Posey's favor in the Tulsa trial at a future trial. Nonetheless, at Posey's capital trial, the State filed pre-trial notice of its intent to present the testimony of Manning and others regarding the prior acquitted conduct. The trial court held three days of evidentiary hearing supplemented with written and oral argument. The State contended the acquitted Tulsa conduct was admissible "to show a common scheme or plan. . . The jury should be able to hear that he has broken into a house and bashed somebody's face and head multiple times before he engaged in sexual assault with her." Dkt. 19-2 at 136, 138.

In response, Posey—based on the hearing testimony—argued that the jury's acquittal on the burglary count necessarily meant that he could not have committed the rape either, as burglary was a condition precedent for any crime occurring at Manning's home. Dkt. 19-2 at 123-24 (defense arguing that "if you're innocent of a burglary in the first degree, if the

---

[3] The Tulsa trial transcripts, post-trial motion to dismiss filings, and the trial court's ruling dismissing the rape count with prejudice further corroborate the existing record and thus support Posey's position. Inexplicably, all prior counsel failed to make these documents part of the record in state court proceedings. Current counsel has concurrently filed a motion asking the Court to take judicial notice of this information, all of which predates Posey's capital case, or to expand the record pursuant to the Rules 5 and 7 of the Rules Governing Section 2254 Cases in the United States District Courts to include this relevant evidence.

jury says that you were not in the house, you did not go in because you're innocent of burglary in the first degree, you cannot then be guilty of the rape."). Relying on double jeopardy collateral estoppel principles, Posey argued that the State was foreclosed from presenting evidence about the Tulsa case at the capital trial. Ultimately, the trial court admitted the Tulsa allegations as propensity evidence under Oklahoma state evidentiary law. Dkt. 19-7 at 10-11; Dkt. 20-3 at 589-90. The court did not address Posey's federal double jeopardy and estoppel arguments based on the acquittals.

Trial counsel was correct and the trial court was wrong. The trial court's ruling unconstitutionally made Posey run the gauntlet a second time. But the Double Jeopardy Clause's issue preclusion component barred the State from trying to convince the capital jury of factual allegations it had already failed to prove and that had already been rejected at the Tulsa trial, even with a lower standard of proof and regardless of any admissibility under Oklahoma evidentiary law.

But that is exactly what the State did at trial. Over Posey's written and oral objections before and during the capital trial,[4] the State—over the course of a two-day trial-within-a-trial—presented the testimony of Manning, a DNA analyst, and two Tulsa investigating officers, as well as nearly 40 exhibits. Dkt. 19-11 at 113-166, 173-275, 282-331. The State simply regurgitated its evidence from the Tulsa trial without any change in witnesses or theories; but the Tulsa jury had already rejected everything the State reoffered at the capital trial. The State even conceded that its presentation in the capital trial was identical to the

---

[4] *See* Dkt. 19-3 at 317-320; Dkt. 19-5 at 1098-1102; Dkt. 19-7 at 5-6; Dkt. 19-11 at 109-110; *id.* at 282; Dkt. 20-2 at 126-130; Dkt 20-2 at 1298-1300.

losing allegations in the capital trial. Dkt. 19-14 at 228 (Manning "came in here and identified Derek Posey again for like the fourth time, I think, as the person that broke into her apartment back in 2008."); *cf.* Dkt. 19-2 at 134 (State arguing at pre-trial hearing that Manning's "story did not change about what had happened to her").

Under *Ashe* and double jeopardy principles, issues necessarily decided in Posey's favor cannot be relitigated in a subsequent trial. Here, the Tulsa jury's acquittal verdicts necessarily and finally decided the ultimate issues that Posey *had not* broken into Manning's home or sexually assaulted her. Thus, the State was barred from presenting witnesses, exhibits, and argument about the Tulsa case in the capital case. Simply, the Constitution prohibited a second bite at the apple.

The *Ashe* Court reasoned that the only issue in dispute at Ashe's first trial was whether he was one of the robbers of a poker game player: the jury's acquittal necessarily determined that he was not. In making that determination, the jury had to reject the State's identification evidence. *Ashe*, 397 U.S. at 446. Accordingly, collateral estoppel prohibited the State from "constitutionally hal[ing] [Ashe] before a new jury to litigate that issue again," even though the latter trial charged Ashe with robbing a different player at the same poker game. *Id.* Similarly, Posey—as a constitutional matter—could not have been forced to litigate the Tulsa burglary, sexual assault, and identity issues again. Under *Ashe,* "[b]ecause the sole issue in dispute in the first trial was whether [Posey] had been [the person who broke into Manning's home and sexually assaulted her], the [Tulsa] jury's acquittal verdict[s] precluded the State from trying to convince the capital jury of those very same facts in [the capital] trial." *Bravo-Fernandez v. United States*, 580 U.S. 5, 11-12 (2016)

12

(citing *Ashe,* 397 U.S. at 445). The trial court's ruling and the State's presentation and argument about the Tulsa acquittals violated Posey's federal double jeopardy rights.

The harm from the trial court's error and the State's trial presentation is clear. The State heavily relied on the Tulsa allegations of which Posey was acquitted to assert that he broke into Ms. Gibbins' house at night with the intent to commit a sexual assault. On top of the *ad nauseum* presentation of the exact same allegations the Tulsa jury had already necessarily rejected, the State repeatedly emphasized the Tulsa allegations in first stage closing argument, stressing that the acquitted Tulsa conduct showed that Posey committed the charged capital crimes. In the final closing argument—when the defense had no chance to respond—the State first stated, "I want to talk to you quite a bit about May Manning and the Tulsa case." Dkt. 19-14 at 227-28. Trial counsel knew that the State tactically would wait until final closing to first discuss this inflammatory evidence "because they were going to talk about it when I sit down where I can't get up again." *Id.* at 159.

The State then tried to draw a clear parallel between the acquitted allegations in the Tulsa case and the allegations in the capital case noting that Manning "testified that Derek Posey basically just beat the crap out of her head and left her face down in her room . . . with a bashed in skull." *Id.* at 228. [5]

---

[5] OCCA similarly acknowledged the prejudice Posey suffered from the State drawing connections between the two cases:

> Testimony concerning the prior break-in and sexual assault demonstrated his propensity to break into and attack single women in their homes in the nighttime and to beat them about the head and sexually assault them while the women were face down.

Next, the State used testimony from a prosecution DNA expert in the Tulsa case to strongly urge guilt based on DNA evidence in the capital case: "[t]here's only evidence of one man in this case who's given his DNA to law enforcement two times and both times he was linked to a sexual assault. I mean, is it any coincidence, ladies and gentlemen?" *Id.* The State clearly implied that even if Posey was innocent of the Tulsa crimes, he must be guilty of the capital crimes because lightning does not strike twice. This was the precise, prejudicial argument trial counsel predicted the State would make if the capital jury heard about the Tulsa case: "what [the State is] trying to do is tell a jury, look, he got away with this one [in Tulsa], don't let him get away with this [capital case]." Dkt. 19-2 at 816; *id.* at 823 (if jury hears about Tulsa case, "it really doesn't matter what [the defense] say[s], because all a jury's going to think about is he got away with a rape in Tulsa.").

Finally, the State returned to the Tulsa case near the end of closing, arguing that Posey's experience with that trial motivated him to kill Ms. Gibbins so that he would not have to stand trial again: "if he left her alive, he wouldn't want t[o] go through the hassle of going to court on this. So[,] he stepped up his game and burned down the house." Dkt. 19-14 at 238. That the State so forcefully argued to convict based on the Tulsa accusations is highly probative of prejudice. *See Johnson v. Mississippi*, 486 U.S. 578, 590 & n.8 (1988).

### C.    OCCA's Resolution of this Claim Does Not Preclude Merits Review Under 28 U.S.C. § 2254(d).

### 1.    OCCA was Unreasonable Under 28 U.S.C. §2254(d)(1)

For the following reasons, OCCA's ruling was unreasonable under § 2254(d)(1):

---

*Posey*, 548 P.3d at 1260.

**First**, OCCA unreasonably treated Posey's claim as a due process claim rather than a double jeopardy claim. *Ashe* is clear that because collateral estoppel "is a part of the Fifth Amendment's guarantee against double jeopardy, . . . its applicability in a particular case is no longer a matter to be left for state court determination within the broad bounds of 'fundamental fairness,' but a matter of constitutional fact we must decide through an examination of the entire record." *Ashe*, 397 U.S. at 442–43. Yet, the OCCA specifically held that "Posey simply has not shown on this record that he was deprived of a *fundamentally fair trial in violation of due process* by admission of the challenged propensity evidence." *Posey*, 548 P.3d at 1262 (emphasis added). Treating a double jeopardy claim as a due process claim with a different standard was patently unreasonable under § 2254(d)(1): "[a] state-court decision will certainly be contrary to [] clearly established [Supreme Court] precedent if the state court applies a rule that contradicts the governing law set forth in [their] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

**Second**, OCCA twice held that, under *Dowling v. United States*, 493 U.S. 342 (1990), "an acquittal verdict in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent case with a lower burden of proof." *Posey*, at 1261; *id.* at 1262. But that is a misreading of *Dowling* because it ignores that *Dowling* does preclude relitigation of an ultimate issue that the jury necessarily decided in acquitting the defendant of some charge. *Dowling*, 493 U.S. at 348. OCCA's assertion that the holding of *Dowling* always allows the prosecution to introduce acquitted conduct simply because of a lower burden of proof was unreasonable under *Dowling*. *Dowling* ruled against the petitioner not because of the lower standard of proof but "because, unlike the situation

in *Ashe v. Swenson,* the prior acquittal did not determine an ultimate issue in the present case." *Id*. at 348. As OCCA rightly acknowledged, "[n]either the trial court nor the Supreme Court found that Dowling had been acquitted on the issue of identification," *Posey*, 548 P.3d at 1262, which was the issue Dowling—like Posey—sought to foreclose from consideration in the subsequent trial. The critical difference is that Posey *was* necessarily acquitted on the issue of identification at his Tulsa trial, so preclusion principles applied.

OCCA's focus on the burden of proof was also unreasonable under *Ashe. Ashe* does not differentiate between the use of acts to establish an element of the offense beyond a reasonable doubt and their introduction under a lower standard of proof pursuant to the rules of evidence. Rather, *Ashe* held that "[i]t is much too late to suggest that this principle [of collateral estoppel] is not fully applicable to a former judgment in a criminal case, . . . because the judgment may reflect only a belief that the Government had not met the higher burden of proof [beyond a reasonable doubt] exacted in such cases[.] " *Ashe*, 397 U.S. at 443 (quotation omitted). Thus, contrary to both *Ashe* and *Dowling*, OCCA unreasonably focused on the standard of proof instead of focusing on what ultimate facts were necessarily found by the Tulsa jury. When an ultimate factual issue is resolved in a prior case, it cannot be relitigated in a subsequent case, regardless of the standard of proof. *Dowling* is simply an application of *Ashe* that hinges on what issue(s) the first jury necessarily decided; when the first jury clearly has made a specific factual finding in rendering its verdict, the prosecution is estopped from asking a second jury to reach a "directly contrary conclusion." *Dowling*, 493 U.S. at 348.

16

OCCA's failure to acknowledge the correct legal standard became more unreasonable when OCCA asserted that Posey had not shown that the Tulsa jury found that he never entered Manning's home because that jury might have "grounded its verdict of acquittal based upon a finding that the State simply did not meet its demanding and highest burden of proof that he committed the charged crimes. . .." *Posey*, 548 P.3d at 1262. The idea that the burden of proof changes the double jeopardy analysis is unreasonable.

**Third**, though OCCA quoted *Ashe's* holding precluding relitigation of "an issue of ultimate fact" that has been finally determined, *id.* at 1261 (quoting *Ashe*, 397 U.S. at 436), OCCA unreasonably failed to analyze Posey's claim under that controlling standard. OCCA never considered that the Tulsa jury determined as ultimate facts that Posey never entered Manning's house nor sexually assaulted her, both facts which then should have been precluded from being relitigated in the capital case.

**Fourth**, OCCA violated *Ashe's* command to apply realism, rationality, and practicality in assessing the necessary factual findings by the Tulsa jury's decision. *Ashe*, 397 U.S. at 444. Instead, contrary to *Ashe*, OCCA made Posey's "task even more formidable by straining to postulate 'hypertechnical and unrealistic' grounds on which the jury could conceivably have rested its conclusions[.]" *Id.* As discussed above, a rational Tulsa jury could not have grounded the acquittals on anything other than a decision that Posey never entered Manning's home. Yet, OCCA ruled that the Tulsa jury "might reasonably have concluded that Posey was the man who entered [Manning's] home" by asserting that the jury might have thought Posey entered the home, just not beyond a reasonable doubt. *Posey*, 548 P.3d at 1262. But Posey either entered Manning's home or he did not, and the Tulsa

17

jury's finding leaves no wiggle room. OCCA's excessively technical approach to collateral estoppel in which it hypothesized an absurd ground for the jury's decision-making contrary to the evidence presented at, and circumstances of, the Tulsa trial is a paradigmatic example of what *Ashe* cautioned against.

### 2.    OCCA Was Unreasonable Under 28 U.S.C. § 2254(d)(2).

For the following reasons, OCCA's ruling was unreasonable under § 2254(d)(2):

**First**, OCCA claimed—without citing any evidence in the state court record—that "[i]t appears identity was not seriously disputed" in Posey's Tulsa trial. *Posey*, 548 P.3d at 1262. But OCCA misapprehended the record. As detailed above, that record clearly shows that *the only* factual issue at the Tulsa trial was the *identity* of the perpetrator of the conduct against Manning. And that record further shows that Posey vehemently and always argued misidentification. For instance, trial counsel repeatedly made clear at the pre-trial hearing that "[identity is] a complete issue in this case . . . because our defense is, we did not do this. Identity is a complete issue."   Dkt. 19-2 at 822; *see also* Dkt 19-2 at 126-27 (same).

Thus, the evidence presented in the state court proceeding record flatly contradicts OCCA's claim. OCCA never acknowledged any evidence or argument from the pre-trial admissibility hearing and even went so far as to erroneously claim that "the record concerning [Posey's] acquittal is sparse." *Posey*, 548 P.3d at 1262. To the contrary, the transcript from the three-day pre-trial hearing on the admissibility of the Tulsa evidence was part of the appellate record before OCCA, but the court failed to consider this highly probative evidence in the state court record. A state court decision is based on "an unreasonable determination of the facts" under (d)(2) if the state court ignores key aspects

18

of the record before it. *See Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) (*Miller-El I*).

Additionally, OCCA's claim that identity was not as issue is a "clear factual error" that is

belied by the evidence in the state court record; OCCA's "partial reliance on an erroneous

factual finding further highlights the unreasonableness of the state court's decision [under

(d)(2)]." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

    **Second,** building on this unreasonable fact finding, OCCA erroneously suggested

that Posey mounted a consent defense, claiming—again without citation to any evidence in

the state court record—that he "admit[ed] [in a police interview] that he had a consensual

encounter with an Asian female." *Posey*, 548 P.3d at 1262.[6]  OCCA misstated the record:

the only evidence before OCCA on the issue of consent was Posey's repeated assertions at

the pre-trial hearing that "[t]his is not a consent case. This is an identity case." Dkt-19-2 at

823; *see also* Dkt-19-2 at 123-24, 126 (defense arguing that Posey's situation is unlike a

case State relies on where defendant did not contest presence), *id.* at 127 (defense arguing

that two sexual assault cases State is relying on are distinguishable because the defense in

both those cases was consent, "never an identity case" like Posey's case).

    Indeed, there is not a scintilla of evidence in the state court record that Posey argued

---

[6] Curiously, OCCA noted that Posey's "sexual encounter with the Asian female occurred in
his apartment," not Manning's. *Posey*, 548 P.3d at 1262 n.24. This is consistent with State-
proffered testimony at the pre-trial hearing that Posey told police about an *earlier,
consensual* sexual experience with an Asian woman. Dkt. 19-11 at 218-19. Thus, that
*separate incident* had nothing to do with any consent issue in the Manning case. To the
extent OCCA conflated the two separate events and then relied on the totally different event
to wrongly assert that Posey mounted a consent defense, OCCA's fact finding was even
more unreasonable.

that he engaged in consensual sex with Manning; rather the record—based on defense argument and the Tulsa jury's findings—is clear that Posey never even entered Manning's home and that someone else was the perpetrator. Whether viewed as OCCA making another clear factual error or OCCA ignoring key aspects of the state court record had before it, OCCA's fact finding of a consent defense was unreasonable. *See Wiggins*, 539 U.S. at 528; *Miller–El I*, 537 U.S. at 346.

OCCA exacerbated its unreasonable finding that Posey relied on a consent defense by also claiming that the jury was weighing a consent defense versus a reasonable doubt defense in the Tulsa case. *Posey*, 548 P.3d at 1262. But, because the defense never raised consent, the jury could not have reasonably or logically considered this option in its deliberations. And with no evidence presented in the state court proceeding to support that the Tulsa jury deliberated on a consent defense, OCCA could only speculate that the jury may have done so. OCCA's fact finding was unreasonable under (d)(2) because the state court record lacks even a speck of foundation for OCCA's claim. *Wiggins*, 539 U.S. at 528.[7]

---

[7] OCCA noted that direct appeal counsel "insist[ed[] . . . that the jury must have acquitted him based upon a finding that no crimes were committed because of consent." *Posey*, 548 P.3d at 1262. As explained above, direct appeal counsel was patently wrong because Posey's sole defense at the Tulsa trial was misidentification. But any misrepresentation of the record by appellate counsel does not absolve OCCA of its independent duty under *Ashe* and *Dowling* to examine the State court record before it to determine the basis for the prior jury's acquittal. *Dowling* 493 U.S. at 350; *Ashe* 397 U.S. at 444. At a minimum, the two-day *Burks* hearing transcript and argument in Posey's capital case, which was squarely in the record before OCCA, plainly shows that Posey's sole defense was misidentification and that he never entered Manning's home. To the extent that consent was noted at the *Burks* hearing, it was by the defense adamantly stating that Posey never raised a consent defense. Dkt-19-2 123-24, 126, 127, 823. Instead, OCCA abandoned the judicial review of the state court record that *Ashe* and *Dowling* mandate, ignored the clear evidence in that record that Posey's defense in the Tulsa case was misidentification—not consent—and instead made

**Third**, OCCA asserted that the Tulsa jury "might reasonably have concluded" that Posey entered Manning's home impermissibly. *Posey*, 548 P.3d at 1262. That is an unreasonable fact finding because Posey either broke into Manning's home or he did not. Whether Posey was the perpetrator who entered Manning's home was squarely at issue in the Tulsa trial and was determined in his favor by the jury's acquittal on the burglary count. The only rationally conceivable explanation for the Tulsa acquittals is that the jury unanimously decided that another person, not Posey, entered Manning's home.

Because the prior acquittals necessarily determined that Posey did not enter Manning's home, the admission of the Tulsa accusations under a lower burden of proof at the capital trial ran afoul of *Ashe* and *Dowling*, contrary to what OCCA found does not change the jury's determination in Posey's favor. The evidence on the state court record in this case "can lead to but one conclusion": Posey never entered Manning's apartment. *Ashe*, 397 U.S. at 445. Thus, there was no rational basis for OCCA to speculate that the Tulsa jury still "might have reasonably concluded" that Posey entered Manning's home. OCCA's assertion otherwise is an unreasonable factual determination under § 2254(d).

OCCA cited *Dowling* to support its finding, but *Dowling* itself shows the

---

an erroneous factual determination, entitling Posey to de novo review under (d)(2).

But if prior counsel's misrepresentation somehow absolved OCCA of its duty to review the available State court record, then prior counsel—especially appellate counsel—were ineffective for erroneously asserting that Posey's defense at the Tulsa trial was consent not misidentification, *Posey*, 548 P.3d at 1262, and also for erroneously "conced[ing] that 'there is no record of the jury trial' so '[w]e have no idea what evidence was presented.'" *Id.* at 1262 n.23 (quoting Posey's direct appeal brief), particularly as appellate counsel had the relevant transcripts and closing arguments from Posey's Tulsa trial available to them in their appellate case files. *See* Kim A. Marks Aff., ¶9, Jan. 13, 2026 (Att. 4).

unreasonableness of OCCA's fact-finding. Dowling did not dispute identity in his first trial, where he was acquitted of burglary and attempted robbery. *Dowling*, 493 U.S. at 346, 351. Indeed, Dowling "was not acquitted on the issue of identification," *id.* at 351, as he conceded before the Supreme Court, *id.* at 352; rather than disputing identity, Dowling "claimed that a robbery had not taken place because he and [his co-defendant] allegedly 'merely came to retrieve . . .  money from an individual in Henry's house.'" *Id.* (quoting trial court hearing transcript) (ellipsis in original). The record from the prior trial did not show "that the question of identity was at issue" nor did the record show that the prior jury determined identity in Dowling's favor. *Id.* at 352. Simply, "Dowling did not demonstrate that his acquittal in his first trial represented a jury determination that he was not one of the men who entered [Henry's] home." *Id.* at 350. Thus, it was permissible for the subsequent jury to consider evidence from the first trial that "Dowling [w]as wearing a mask and carrying a gun similar to the mask worn and the gun carried by the [bank] robber [to] strengthen[] the Government's identification of Dowling as the bank robber" in the subsequent trial. *Id.* at 345. Because Dowling did not dispute entry into Henry's home but rather whether he entered with any criminal intent, the earlier jury could decide beyond a reasonable doubt that he was not guilty of burglary or attempted robbery but still "might reasonably conclude that Dowling was the masked man who entered Henry's home." *Id.* at 348-49. With identity not at issue in Dowling, it was fair game to present evidence from the prior trial supporting the identity of the bank robber in the later trial because that did not require the later jury to reach "a directly contrary conclusion" to the first jury. *Id.* at 348.

22

By contrast, once the Tulsa jury acquitted Posey of burglary in a situation where he disputed identity, "seriously contested" that he ever entered Manning's home, *id.* at 351, did not allege he had a consensual sexual encounter with Manning, and where there was no evidence of a second perpetrator, the only "possible explanation[] for the jury's acquittal verdict at [Posey's] first trial," *id.* at 352, is that they determined Posey never entered Manning's home for any purpose. Unlike *Dowling*, because the Tulsa jury's acquittal on the burglary count necessarily reflects that Posey never entered Manning's home, any assertion that Posey did   break into Manning's home would have required the Tulsa jury to "reach[] a directly contrary conclusion." *Id.* at 348. Because Posey prevailed on the ultimate issue of identity, OCCA was unreasonable in finding that the Tulsa jury somehow might reasonably have concluded Posey entered Manning's home.

## II.   THE DISTRICT COURT VIOLATED POSEY'S RIGHT TO AN IMPARTIAL JURY BY IMPROPERLY STRIKING THREE PANELISTS FOR CAUSE. [8]

### A.   Legal Standard

When a trial court "excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence imposed by the jury cannot stand." *Gray v. Mississippi*, 481 U.S. 648, 650-51 (1987). The erroneous disqualification of even a single prospective juror requires that a death sentence be reversed. Venire members may not be excluded "for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

---

[8]  Posey raised this Ground as Proposition V on direct appeal.

The ultimate question is whether a juror will be able "to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. 412, 427 (1985). A prospective juror who is opposed to the death penalty may be struck for cause only if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A trial court may not strike for cause "jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial." *Witt*, 469 U.S. at 421. Venire members may not be excluded "for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon,* 391 U.S. at 522. Indeed, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

The trial court here—which had never conducted capital voir dire—struck several prospective jurors for cause based on their death penalty views. But three of these strikes were in error. Each of these three panelists, despite personal objections to the death penalty, showed that they would be able to follow the law and adhere to their oaths.

### B.     Improper For-Cause Strikes in Posey's Case

#### 1.     Prospective Juror Sharon Young

Sharon Young stated "that anyone could be rehabilitated" and that she wasn't sure if she "could sleep at night, if [she] sentenced someone to death." Dkt. 19-4 at 1027. Her statements were acceptable under Supreme Court precedent that someone with scruples

24

towards the death penalty or worries about the case's emotional effect on them is still eligible to serve. *See Lockhart*, 476 U.S. at 176; *Adams*, 448 U.S. at 50; *Witherspoon*, 391 U.S. at 522. The Supreme Court has made clear that a panelist can still serve even if they were emotionally "affected by the prospect of the death penalty." *Adams*, 448 U.S. at 50. The Court has held that "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability. . . to follow the court's instructions and obey their oaths. . .." *Id.*

The trial judge asked whether Young's views would "substantially impair" her ability to consider imposing death. Dkt. 19-4 at 1028. Young answered, "I'm not sure I could impose death. . . I would like to serve as a person who might vote against the death penalty" *Id.* at 1029. Young's words reflected the law that a capital jury can and should include those who are not "uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521. The trial judge affirmed this principle: "We don't want a jury that's all planning on imposing any particular punishment." Dkt. 19-4 at 1032.

Young's answers demonstrated that she was not committed to any specific punishment. Indeed, when the State asked, "Is it realistic to see yourself voting for any of the three, if you deem the circumstances appropriate?" Young was clear: "Yes." *Id.* at 1054. The State probed, "It's realistic that you could vote for death, in the right case?" *Id.* at 1054-55. Young offered an example of a "right case": "I believe the death penalty should exist for sociopaths[,]" adding that she believed "[n]ot all" people could be rehabilitated. *Id.* at 1055. Young later explained, "If I thought there was no possibility of redemption or rehabilitation...that they would pose a risk of escape or killing someone else in prison. . . I

25

could vote for the death penalty." *Id.* at 1119-20. Through these answers, Young provided *multiple* examples where she could envision herself voting for the death, including in the presence of aggravating circumstances such as a continued threat (in cases where "they would pose a risk of escape or killing someone else in prison").

Young's voir dire is analogous to that of jurors accepted by the Supreme Court in *Gray*. The Court found that a prospective juror who was "initially somewhat confused in her response" but later "stated that she could reach a guilty verdict and vote to impose the death penalty" was "clearly qualified to be a juror." *Gray*, 481 U.S. at 650; *see also id.* at 652 (taking issue with the fact that the State attempted to strike for cause all prospective jurors who "expressed any degree of uncertainty in the ability to cast" a vote to impose the death penalty). Similarly, Young expressed uncertainty at first but ultimately affirmed that she could consider and vote for the death penalty as the law asked her to do.

The State informed Young that the burden of proof in a capital case was the same as that of a shoplifting case. Dkt. 19-4 at 1060. When asked whether she would "expect a greater standard of evidence" in a murder trial, Young said, "Probably, yes." *Id.* The State argued that Young would hold them to a higher burden of proof than the law required, but her answer reflected federal precedent. *See Adams*, 448 U.S. at 49 (finding it acceptable for a juror to express "that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness"); *see also id*. at 50 ("Nor in our view would the Constitution permit the exclusion of jurors…who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments. . . are inherent in the jury system").

26

The defense clarified Young's understanding of the burden of proof. The defense asked, "does it make sense to you…[the State's] burden is beyond a reasonable doubt?" Dkt. 19-4 at 1118. Young answered, "Yes." *Id.* When the defense asked, "will you hold them to their burden of beyond a reasonable doubt?" Young again answered, "Yes." *Id.* The defense then asked, "And you won't ask them to do more than that, right?" *Id.* To this, Young responded, "How could there be more than. . . reasonable doubt?" *Id.* Young answered clearly that she would not hold the State to a standard beyond what the law required; she could not even imagine such a standard beyond reasonable doubt.

The State took issue with Young's belief in the existence of discrimination in the legal system. *Id.* at 1060. Young expressed "heightened concern" about the case involving an African American defendant. *Id.* at 1061. But this belief affirmed Young's commitment to impartiality; she hoped to avoid discrimination while considering sentencing. Despite Young's personal opinions about the death penalty (which she was entitled to have), she was committed to the rule of law. She agreed that she could fairly decide guilt at the conviction stage. *Id.* at 1055. When referring to jury deliberations, she also stated, "I can keep an open mind through the process." *Id.* at 1080. She agreed she could "give a just result" *Id.* at 1081. When asked, "you could consider all three punishments, right?" Young answered, "I think society must have the death penalty as a last resort. I can consider all three." *Id.* at 1119. Young confirmed that she believed the death penalty should exist and would be willing to consider and apply it. Like the juror in *Gray*, Young was "clearly qualified" to be a juror. *Gray*, 481 U.S. at 650.

2.    **Prospective Juror Carolyn Bish**

Carolyn Bish stated that she felt the death penalty "should be available[,]" but she was "not sure" if she could "actually deliver it." Dkt. 19-5 at 45. The State asked, "is it realistic to see yourself giving real consideration to voting for the death penalty?" *Id.* at 5, 46. Bish answered, "Yes." *Id.* at 46. The State noted that Bish had sighed. *Id.* Bish explained that she didn't know if she could "actually vote to impose" death. *Id.* at 46. The State then suggested that "meaningful consideration" did not include acknowledging that one could do something while knowing that they would not "do that in the end" *Id.* at 47. The State asked, given these parameters, could Bish meaningfully consider the death penalty? Bish answered, "I don't think so." *Id.* at 47. The Court noted that Bish equivocated in her answers. *Id.* at 51. But the State's questioning led to such confusion – the State seemed to suggest that if Bish would not actually end up voting for the death penalty, she could not meaningfully consider it. But the State has no entitlement to a "a tribunal organized to return a verdict of death" *Witherspoon*, 391 U.S. at 521. A juror's commitment to judiciously applying the law to the facts does not include a commitment to actually voting for death.

Even so, Bish asked the Court whether she could "give you a situation where I would[,]" though the Court declined. Dkt. 19-5 at 48. She stated, "I don't know that I can [impose the death penalty], regardless of what happens." *Id.* The Court expressed concern over the phrase "regardless of what happens." *Id.* at 51-52. But Bish's answers taken together paint a clear picture: she could envision "a situation" where she could impose the death penalty, but she did not believe she could impose death "regardless of what happens." No juror should impose death *regardless* of the facts – Bish's statement made clear that her

28

decision would rest on the specific facts, which is exactly how a juror should operate.

The defense was not permitted to question Bish. *Id.* at 56. The State asked whether Bish, though she was "comfortable with the death penalty being part of the law," would rather not be in a position to condemn someone to death, and Bish said, "yes." *Id.* at 53. But preferring not to be a juror does not impact whether someone is *qualified* to be a juror.[9] Bish explained she was "wanting very much to do the right thing and very much afraid I'll do the wrong thing" *Id.* The State pressed, "you're not sure you can really trust yourself to consider all options[?]" *Id.* at 54. Bish hesitated before answering, "yes." *Id.*[10] The State moved to strike Bish for cause. *Id.*

Bish's answers reflect those *Adams* found valid. She was nervous of the responsibility of determining whether someone should die, but this was not equivalent to a *substantial impairment* in her ability to obey her oath. *See Adams*, 448 U.S. at 50. Her answers showed that she would be conscientious about the facts and her duty to "do the right thing."

---

[9] *See Gray*, 481 U.S. at 652-53 (trial court properly refused to strike for cause jurors who seemed to be expressing disapproval towards the death penalty to "get off the jury[,]" demonstrating that preference against being impaneled is not disqualifying).

[10] The defense and State disagreed as to the meaning of Bish not "trusting" herself; the defense requested to voir dire for clarity, as it appeared Bish intended that her "mistrust" stemmed from a fear of ultimately making the wrong decision in a situation with such high stakes, but the Court denied them the opportunity. Dkt. 19-5 at 55. *See Gray*, at 663 (finding it problematic that the trial judge did not further question venire members, as "venire members might have clarified their positions upon further questioning. . . It might have become clear that they could set aside their scruples and serve as jurors.").

### 3.    Prospective Juror Crystal Howard

When asked to explain her feelings on the death penalty, Crystal Howard answered, "I would choose not to impose it, as much as possible." Dkt. 19-5 at 757. She added, "It's hard to say, without knowing the particulars of the case and the background of the people involved, whether there could be room for redemption for the person committing the crime." *Id*. Her response indicated that she would base any decision to impose the death penalty on the facts and an understanding of the defendant's background and potential for redemption, essentially alluding to the weighing of aggravating and mitigating factors. Howard added that she was not "a hundred percent" sure how she felt without "being exposed to the circumstances," though she was generally opposed to the death penalty and its potential for unfair application. *Id.* at 758. She believed the penalty "should be prevented if at all possible," but felt that "premeditated murder and mass murder" could deserve death. *Id.* at 758-59. She stated, "it would be difficult" for her to impose the death penalty "without knowing" and that generally opportunities for reform "should be explored." *Id.* at 759-60. Howard's answers demonstrated a desire to consider all the facts. This is exactly how a juror should "conscientiously apply the law to the facts" when multiple punishment options are possible. *Witt*, 469 U.S. at 421.

The State pressed Howard, asking "there is extremely limited situations where you would even consider [death] as an option?" and "you probably wouldn't consider it in every single case?" Dkt. 19-5 at 760. Howard answered, "Yes." *Id.* She said for the "ones I would, I think it would be very difficult." *Id.* at 762. The State argued that this response disqualified Howard, but their question was so general that Howard's answer in fact matched the law.

30

*Id.* at 792. Of course, a juror should not consider the death penalty in "every single case;" jurors should only do so when certain burdens are met.

When the trial judge asked a longer, more technical question about the imposition of death, Howard seemed unsure, answering, "I guess it's hard, not knowing, to give a definite yes or no to that." *Id.* at 762. The State said her answers were "a little bit confusing," and Howard confirmed she was "confused about it" herself. *Id.* at 763. The State asked whether the prosecution was "behind" with Howard, and she expressed confusion about the strangeness of that question, too, asking "What do you mean?" *Id.* To this request for clarification, the State only repeated itself. *Id.*

The State did not question Howard more, renewing the motion only to emphasize a belief that Howard was "likely to be affected" because of her family's connection to the Murrah bombing. *Id.* at 817. The State based this prediction on the fact that Howard had initially felt, as a teenager, that she wanted the Murrah bombing perpetrators "to be blown up too[,]" though she had "grown up a lot since then." *Id.* at 761. But how this suggests Howard would be ineligible to serve was neither explained nor follows logically—simply being "affected by the prospect of the death penalty" is not disqualifying. *Adams*, 448 U.S. at 50. If anything, Howard's comment showed she had envisioned situations where she could find death appropriate, but she also valued "trying to balance love and understanding[,]" emphasizing her focus on impartiality. *Id.* at 761.

Finally, the State repeated its overbroad claim and complete misrepresentation of the

record [11] that Howard "cannot consider the death penalty in every case," and the Court dismissed Howard for cause. *Id.* at 816-17. Howard clearly stated that she would base her decisions on the facts and that she could see situations where the death penalty might be appropriate. *Id.* at 757-59. She expressed confusion only after the State's questions were vague. Her answers demonstrated a commitment to the duty of impartiality required by her oath, never suggesting that her performance would be substantially impaired.

### C. OCCA's Resolution of This Claim Does Not Preclude Merits Review Under § 2254(d).

#### 1. OCCA Unreasonably Applied *Witt* Under § 2254(d)(1).

OCCA did not cite *Witherspoon* or *Witt* or other Supreme Court precedent for this claim. OCCA referred to *Witt's* substantial impairment standard in adjudicating a previous claim, but it did not use this standard for any of the jurors improperly struck for cause due to objections against the death penalty. OCCA did quote the trial court's use of the phrase "substantially impair" in questioning Young, but again, it did not incorporate this standard in its conclusion or analysis. *Posey*, 548 P.3d at 1269. Instead, OCCA used phrases such as "compromised" and "cast doubt about[.]" *Id.* at 1267-68. Because OCCA did not apply the proper "substantial impairment" standard under *Witt* and *Adams*, its conclusion was contrary to and/or an unreasonable application of clearly established federal law.

#### 2. OCCA Unreasonably Determined the Facts Under § 2254(d)(2).

OCCA's decision was based on an unreasonable determination of the facts in light

---

[11] Howard stated multiple times that she believed premeditated murder and mass murder could deserve the death penalty, explaining them as "the first that come to mind," suggesting also that these situations were examples, not limitations. Dkt. 19-5 at 762.

of the evidence presented in the State court proceeding. OCCA found that Young's "responses . . . indicat[ed] she would meaningfully consider the death penalty. . .." *Id.* at 1268. Yet, OCCA concluded that her responses "cast doubt about her ability to perform her duties as a juror." *Id.* If Young *would* meaningfully consider the death penalty, as OCCA found that she would, Young should have been qualified to serve. Even if there *were* doubts about Young's ability to consider the death penalty, simple "doubt" is not equivalent to the *Adams* standard requiring a finding that the juror's views would "prevent or substantially impair" performance.

OCCA found that the district court properly dismissed Bish because her "internal struggle was evident and supported the court's finding she was unable to perform her duties" *Posey*, 548 P.3d at 1269. But Bish repeatedly explained that she wanted to do the right thing, follow the law, and consider all the facts, that she believed the death penalty should exist, and that she could provide an example of when it would be appropriate. Dkt. 19-5, 46-53. Her nervousness and "internal struggle" are not acceptable cause for disqualification, and her answers showed that she would take her oath seriously. *See Adams*, 448 U.S. at 50. OCCA's statement that Bish "had doubts about her ability to" consider the death penalty does not consider that her first answer to whether she could "give real consideration to voting for the death penalty" was in the affirmative, and only changed when the State gave a confusing definition of meaningful consideration, which the defense was not allowed to clarify. *Posey*, 548 P.3d at 1269; Dkt. 19-5, 46-7. OCCA's remark that Bish "candidly conceded that she did not believe she could follow through if it came to weighing the question of punishment during deliberations" is also a misstatement of the record. *Posey*,

33

548 P.3d at 1269. Bish stated that she would "hate to assume" that she would get to deliberations and realize she might not "impose the death penalty" Dkt. 19-5, 48. But this expresses only a nervousness about the gravity of the duty and not that she would be unable to perform the duty.

OCCA stated that Howard was "unable to identify" situations in which the death penalty was appropriate but also acknowledged that Howard listed premeditated murder and mass murder as crimes that could qualify for the death penalty, contradicting its first statement. *Posey*, 548 P.3d at 1269-70. OCCA found that Howard's "hesitancy and indecision. . . supported a finding that she was unable to perform her duties[,]" but hesitancy and indecision about a general opinion on the death penalty do not amount to substantial impairment. *Id*. at 1270. Howard repeatedly expressed her desire to consider the facts of a specific case before determining the appropriateness of the death penalty, as required by her oath. Dkt. 19-5, 758-61. Nowhere did her commitment to facts and balance suggest that she was substantially impaired to perform her duties as a juror.

## III.    THE STATE VIOLATED THE FOURTEENTH AMENDMENT BY USING RACE TO SELECT THE JURY. [12]

### A.    Legal Standard

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)) (internal quotations omitted). To prove the State used peremptory challenges in a racially discriminatory manner, a defendant must first make a

---

[12]    Posey raised this Ground as Proposition VI on direct appeal.

"prima facie showing" of discrimination, *Batson v. Kentucky*, 476 U.S. 79, 97 (1986), which requires showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Washington v. Davis*, 426 U.S. 229, 239-242 (1976)). Then, "the burden shifts to the State to come forward with a neutral explanation" for the strike. *Batson*, 476 U.S. at 97. Finally, the trial court decides "whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019). Through these three steps, the court "determine[s] if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. The inquiry "involves an evaluation of the prosecutor's credibility" during which "all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 477-78.

The State's purportedly race-neutral reasons for striking panelists cannot be accepted if they are pretextual, as a "pretextual explanation naturally gives rise to an inference of discriminatory intent." *Id.* at 485. Three tools help identify pretext. First, if "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" demonstrate that "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("*Miller-El II*"). Second, a discriminatory purpose may be inferred from the State's mischaracterization of the record to proffer race-neutral reasons. *Foster*, 578 U.S. at 512-13. Third, analyzing the State's "questions and statements during voir dire examination and in exercising [its] challenges may support or refute an

35

inference of discriminatory purpose." *Batson*, 476 U.S. at 97. "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338-339 (2003) ("*Miller-El I*"). At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

### B.    The *Batson* Violation at Posey's Trial

In Posey's case, the three-step, burden-shifting inquiry shows that the State unconstitutionally struck a prospective Black juror based on her race. Posey made a *Batson* challenge when the State asked to strike panelist Teresina Wright. Posey showed that Wright was one of two African American panelists, and the State had already struck a Hispanic woman. Dkt. 19-6 at 264-68. The State offered the following neutral reasons: (1) Wright had worked in corrections; (2) Wright was questioned by the defense on her sentencing knowledge; (3) Wright raised questions about her impartiality; (4) Wright was hesitant about the death penalty; and (5) Wright had relatives involved in crimes. *Id.* at 265-67. At trial, the court never provided a reason for accepting the State's explanation; nor did it find on the record that the State's explanation was credible.  Instead, the trial court concluded that "at this time that the State has shown race neutral reasons to exercise their peremptory challenge." *Id.* at 268. This validates that the State performed *Batson* step two, but it does not complete the court's duty under step three: to evaluate whether the reasons were persuasive. The record shows that all the State's reasons were pretextual.

### 1.    The State's Emphasis on Wright's Career was Pretextual.

The State first claimed it struck Wright because she "previously worked on death row in the Department of corrections in Oklahoma. She also worked at Avalon which is central to some of the propensity evidence." Dkt. 19-6 at 265. But, despite these supposed concerns, the State readily accepted David Huntley, a white panelist with a significant corrections and law enforcement background. Huntley previously worked as an officer in juvenile detention and at the time of voir dire was an Oklahoma state security guard. Dkt. 19-4 at 573; Dkt. 19-5 at 1153. Wright, on the other hand, had not worked in the criminal justice system for at least eight years. Dkt. 19-4 at 397. Wright was a prison guard, case manager, and an administrator in her time with corrections. *Id.* at 397-98; Dkt. 19-5 at 1157. In these roles, she did not carry a gun. She did not make arrests. She was not *in the process of becoming a police officer.* Huntley was. Dkt. 19-4 at 584. He was CLEET-certified, made arrests, detained people, and explained, "We operate almost just like the police department." *Id.* at 576-85. [13]

Beyond this comparison, the State's emphasis on Wright's nearly decade-old employment is unconvincing because it made a big point of the difference between former

---

[13] When the defense requested to strike Huntley for cause, the State argued that being a security guard was "not a law enforcement commission like a police officer or a deputy sheriff would have...There's no evidence that he makes arrests or holds custody[.]" Dkt. 19-4 at 574-75. After questioning by the defense proved this assumption wrong (*see id.* at 576-77: Huntley admitting he holds people in custody), the State asked no additional questions. *See id.* at 577 ("MR. MURREY: No questions."). The State's initial argument suggested that if Huntley *did* make arrests or hold custody, then his role as a security guard might be comparable to a law enforcement commission and eligible to be struck for cause. But once this similarity was established, the State nonetheless accepted Huntley.

and current employment for other panelists. Posey objected to Marty Hileman, who had stopped working in law enforcement "two and a half years" ago but still held his CLEET certification. Dkt. 19-4 at 880. The State responded, "practicing attorneys are barred from juries, but nonpracticing attorneys are not barred…that's highly analogous." *Id.* at 883. The State's selective application of this analogy is telling given Hileman had only been out of the field for two years, while Wright had not been in corrections for *eight.* The State's repeated approval of white jurors with law enforcement backgrounds demonstrates that it did not strike Wright due to her employment. It did so because of her race.

The State's limited questioning on Wright's employment is another reason to doubt the State's concerns. Under *Flowers* and *Miller-El II*, "failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Flowers*, 588 U.S. at 312 (*quoting Miller-El II*, 545 U.S. at 246) (internal quotations omitted).

Both the State and Posey questioned Wright about her career. The State went first, focusing on Wright's interactions with inmates and duties transporting people to court. The State asked one question about her work on death row, which she described as "general correctional officer duties." Dkt. 19-5 at 1160-65. The State did not ask Wright about conditions in maximum security or levels of sentences. Posey, once the State was finished, did. *Id.* at 1166-67. The State did not ask Wright about individuals on death row, or whether Wright was involved in preparing for executions. Posey did. *Id.* at 1165. The State did not ask Wright about Avalon beyond when she worked there and whether she had given tours. *Id.* at 1161, 1174. Posey did. *Id.* at 1172-73. Because the State asked only basic questions

38

about Avalon and inquired, "So you interacted with inmates in the Department of corrections almost daily for the -- like the majority of your career?" after Wright explained she worked on death row, the State's first reason for the strike is unconvincing. [14] *Id.* at 1162. Rather, the voir dire record is critical evidence that the State was only concerned about Wright's employment when required to come up with a race-neutral reason.

In countering the *Batson* objection, the State spent much time detailing Wright's resume. However, it never explained the *problem* with her employment history. Why a connection to the justice system would be undesirable for the State is unclear. In fact, the record demonstrates the State's *preference* for jurors with such backgrounds: when Posey moved to strike James Woods for cause because he had worked for a police department, had friends in law enforcement, and stated, "On my background and everything, I'll probably err on the side of favoring law enforcement[,]" the State responded, "I didn't hear anything that I could readily say rose to the level of cause to be removed." Dkt. 19-5 at 624-27. [15] The State repeatedly defended keeping panelists with law enforcement and correctional backgrounds against defense objections. *See* Dkt. 19-4 at 574-75, 883. This pattern shows that panelists connected to the justice system were generally favored by the State. As a result, the State's unique concern regarding Wright's work history falls flat; simply stating the race-neutral fact that Wright held certain jobs is not convincing as a race-neutral *reason*

---

[14] When the State asked if panelists had been inside a prison and Wright raised a hand, the State cut her off: "we've already talked about your experience on that, so thank you." Dkt. 19-5 at 1198. The State was uninterested in learning more about Wright's employment.

[15] Woods was ultimately excused due to a connection to a potential witness. Dkt. 19-5 at 628.

to strike her.

### 2.    The State's Statement that Wright Had Sentencing Knowledge was Purely Afterthought.

Upon further probing of its decision to strike Wright, the State offered, as a race-neutral reason: "Defense team also spent a lot of time speaking with her about her understandings of life, life without parole. . .." Dkt. 19-6 at 266. But this was only a potential issue for Posey. *See* Dkt. 19-5 at 1169 ("MS. SMITH: Sure. One of my concerns is that…you'e [sic] going to have a lot more knowledge about like a life with parole sentence[.]"). Nothing during voir dire suggests that Wright's knowledge of penalties was a worry for the *State*, which spent *no* time questioning Wright about her understandings of life and life without parole. As a result, the State's sudden concern during the *Batson* discussion "reeks of afterthought." [16] *Miller-El II*, 545 U.S. at 246 (finding that a "substitute reason" has "pretextual timing" because the State had not asked questions about its supposed concern during voir dire, "as it probably would have done if the [information] had actually mattered").

### 3.    The State's Argument that Wright Would not be Impartial is Refuted by the Record.

A considerable reason to doubt the State's race-neutral explanations is that the record shows Wright to be an ideal juror for the State. In *Miller-El II*, the Supreme Court held that

---

[16] Notably, after the State provided its first race neutral reason, the court asked, "Anything else?" Dkt. 19-6 at 265. The State responded: "No." *Id*. After the defense responded, the State provided additional reasons, though it said, "Your Honor, we're only required to come up with one." *Id*. at 267.

a prosecutor's race-neutral explanations could not be accepted because the panelist "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence[.]" *Miller-El II*, 545 U.S. at 247. The Court noted that "the credibility of reasons given can be measured by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy[.]" *Id.* (quoting *Miller-El I*, 537 U.S. at 339) (internal quotations omitted). Through this lens, the State's rationale for striking Wright appears particularly improbable.

After offering Wright's career as a race-neutral reason, the State added, "she has raised herself some questions about whether or not she can be fair." Dkt. 19-6 at 266. Wright stated on her questionnaire that "I really think working for the Department of Corrections will not allow me to be truly impartial[.]" Dkt. 19-5 at 1163. However, when asked to clarify, she explained that she was not sure the court would accept her because "I've been around criminals all my life[.]" *Id.* She added that inmates she interacted with had "never told [her] that they were innocent[,]" and as such, "they were exactly where they were supposed to be. . . they did the crime." *Id.* at 1165. Wright did not doubt inmates' guilt and approved of their sentences, both factors that made her likely to be sympathetic to the State.[17] Indeed, the trial court reminded Wright that Posey was not yet a criminal. After Wright stated, "I was a little uncomfortable working with criminals again. That's why I got out of that field[,]" the judge replied, "you were working with people who had been found guilty. . .And right now all we have is a person who has been accused. . . Do you see the

---

[17] Wright also ranked her opinion of law enforcement in Canadian County a ten out of ten. Dkt. 19-5 at 1179.

distinction here?" Dkt. 19-4 at 398-99. If anything, Wright's responses showed proclivity toward voting guilty.

Regardless, Wright clarified these concerns and affirmed consistently that she would still be a fair juror. When the State asked, "Do you think that your background...would cause you to favor one side or the other in this case?" Wright was emphatic: "No." Dkt. 19-5 at 1164. The State asked: "How are you able to reconcile what you've put on the questionnaire . . .with what you're saying today?" *Id*. Wright explained that she had not known whether the court would "trust" her, suggesting that even though *she* believed she would be impartial, she had not known whether her background would impact *the court's* perception of her. *Id.* No less than six times over the course of voir dire, Wright said she could be impartial. *See id.* at 1018 (the Court asked four times whether Wright would be fair, and each time Wright said she would); *id.* at 1115 ("THE COURT: Do you think you can still be a fair and impartial juror? PROSPECTIVE JUROR WRIGHT: Yes, sir. Yes, of course."); *id*. at 1148 (When asked by the State, "do you think that you would be a good juror?" Wright responded, "Yes, sir. . . I would listen to both sides and I would go by. . .what the law says I need to go by.").

Though Wright's questionnaire posed an initial concern about her impartiality, the context she later provided during voir dire—along with her repeated affirmations that she would be fair—prove that she posed no issue for the State. The State itself admitted that "the case law is clear. The written questionnaire cannot trump the voir dire." Dkt. 19-4 at 1133. Even if the State disbelieved Wright as it is "entitled to," the only potential bias Wright showed was in the State's favor. *See Foster*, 578 U.S. at 509-10 (finding that

42

repeated affirmations by a prospective juror weigh against the State's race-neutral reason). From Wright's career to her opinions of inmates' guilt, the State had no reason to believe she would not be an ideal juror, except for her race.

### 4. The State Mischaracterized Wright's Opinions on the Death Penalty.

The State asserted that Wright "also expressed some hesitation about the death penalty." Dkt. 19-6 at 267. But the record refutes this supposed concern. When asked if she could meaningfully consider each of the three punishments, Wright answered: "Yes, sir." Dkt. 19-4 at 441. When the State followed with, "any one of the three might be appropriate, in your mind?" Wright responded, "They would," adding that for death, "the evidence would have to be clear, very clear." *Id*. The State asked again if Wright could realistically vote for the death penalty under the right circumstances, and Wright acknowledged it "would be hard, but I could." *Id*. In the moment, the State agreed: "that's a perfectly acceptable position. That falls within your prerogative." *Id*. Beyond Wright's support of the death penalty, the record also demonstrates the State's approval of her answers.

Each time the State asked whether Wright could meaningfully consider the death penalty, she expressed that she would. *See Foster*, 578 U.S. at 509-10 (crediting a panelist's repeated statements that he would be able to impose the death penalty against the State's race-neutral justification to the contrary). When the defense asked, "[w]hat are your views on the death penalty?" Wright noted the complexity of the sentence: "I think it's harsh, because even though, like you said, it's the worst of the worst. . . I don't think it should just be automatic." Dkt. 19-4 at 485-86. Wright's response did not show hesitation; instead, her

statement that death should not be automatic accurately stated the law.

Wright's response echoes answers given by Huntley, whom the State readily accepted. Huntley stated the death penalty "should only be in the most heinous of crimes" and gave himself an eight out of ten for his favorability towards the sentence because "things are a lot more – they're not always black and white. They're sometimes gray." Dkt. 19-4 at 615, 626. Once again, the State accepted in Huntley what it later identified as problematic in Wright. Considering the State went from finding Wright's answer "perfectly acceptable" to using it as a race-neutral reason for the strike, "[t]here is no good reason to doubt that the State's afterthought. . . was anything but makeweight." *Miller-El II*, 545 U.S. at 246.

### 5. Comparison Evidence Shows the State was Unconcerned with Other Panelists who had Relatives Connected to Crime.

The State lastly claimed it struck Wright because she "had other people in her family that have been involved in crimes[.]" Dkt. 19-6 at 267. The State added, "those are typically people that we strike. . . regardless of whatever color they may be." *Id.* However, the State did *not* strike other panelists who had relatives with connections to crimes.

Wright's nephews had been convicted of crimes 12 years ago, but she was not certain about the details. Dkt. 19-5 at 1017. [18] Huntley also had a relative who had "been involved" in a crime. His "brother was arrested and he spent some time in Oklahoma County[.]" *Id.* at 1006. Though Wright's nephews were convicted and Huntley's brother was not, this distinction is insignificant. The State's supposed policy was not to strike only those whose

---

[18] When asked whether this would impact her impartiality, Wright was resolute: to each of four follow-up questions, she answered that she could still be fair. Dkt. 19-5 at 1006.

relatives were convicted, but those whose relatives had "been involved in crimes[.]" Dkt. 19-6 at 267. And, had the State truly been concerned about Wright's nephews, it might have inquired whether Wright and her nephews were even close. *See Flowers*, 588 U.S. at 286 (finding it relevant that "the State did not ask [] follow-up questions in order to explore the depth of those relationships" which it claimed it found, as a rule, to be concerning.). Similarly, the State should also have been concerned about Huntley's *personal* involvement in criminal matters. Huntley identified himself as the victim of a crime and shared that he had also testified as a witness in a murder trial as a teenager. Dkt. 19-5 at 1186, 1209. Given the State's claimed policy of "typically" striking people who had familial or personal connections to crimes, Huntley should have fallen within the "typical" category; that he did not shows the State's race-neutral reason was pretextual.

The State also accepted other panelists with connections to crimes. Christopher Colbert shared that his ex-girlfriend "was murdered with her son, and the evidence was that basically the house was set on fire." Dkt. 19-4 at 97. When the defense moved to strike Colbert based on the astonishingly similar facts to Posey's case, the State answered, "having life experience connected to victims of crime is not a disqualifying feature[.]" *Id.* at 196. Steven Bowman shared that his sister-in-law had been brutally raped in a home invasion. Dkt. 19-5 at 20. The State once again objected to removal for cause. *Id*. at 22.

The State also had no objection to panelists connected to *perpetrators* of crimes. Kimberly Gunion revealed that her father "chose to rape four women[.]" *Id.* at 42. The State had no follow-up questions. Later, when the defense requested to remove Gunion for cause,

45

the State argued in her favor. [19] *Id*. at 173. Michael Thomas shared that his father was incarcerated for domestic violence. [20] *Id.* at 982. Again, the State had no follow-ups. The State also did not have follow-ups or objections to Lisa Horn, whose cousin was in prison for robbery. *Id*. at 992. Nor to John Michael Gordon, who had two cousins with drug charges, one of whom was incarcerated. [21] *Id*. at 1005. Nor to Carli Christine Sanders, whose daughter-in-law was convicted of breaking and entering, credit card theft, and fraud. *Id*, 1016. Nor to Curbette Sadler, whose son was charged with burglary. [22] *Id*. at 1019. Nor to Steven Been, who wrote on his questionnaire that his cousin was in prison for murder, and who ultimately served on Posey's jury. Juror Information Sheet for Steven Wesley Been, *State v. Posey*, No. CF-2013-463, at 17 (Canadian Cnty. Dist. Ct. Dec. 12, 2018) (Att. 5) These panelists should have been struck under the State's "typical" policy, but that they were not shows that the State did not truly have such a policy but rather that its "race-neutral" reason was fabrication.

### 6.    Each of the State's Race-Neutral Reasons Were Pretextual.

Though the State offered race-neutral explanations for striking Wright, "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El II*, 545 U.S. at 252. The inquiry does not end when the State provides a race-neutral explanation

---

[19]  Gunion was removed for cause for refusing to consider mitigation. Dkt. 19-5 at 172.

[20]  Thomas was later removed for cause for appearing late to court. Dkt. 19-6 at 57.

[21]  Gordon was excused by the defense. Dkt. 19-6 at 269.

[22]  Sanders, Sadler, and Horn were accepted onto the jury, though Posey listed all three as panelists he would have struck given more peremptory strikes. Dkt. 19-6 at 272.

with some grounds in reality. Instead, *Batson* "requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Id.*

Here, each of the State's reasons are contradicted by the record or the State's acceptance of similarly situated panelists. The State's claim that it took issue with Wright's job history or the fact that her nephews were incarcerated is unconvincing given comparison evidence and a lack of meaningful voir dire. Its claim that Wright's knowledge of sentencing posed a concern is implausible, as the State never asked Wright about the subject. And its claims that Wright was biased and hesitant about the death penalty are refuted by the record. Side-by-side comparisons between Wright and white venire members the State accepted further show the pretext. Overall, the State's explanations are improbable and implausible, and thus pretextual. *See Miller-El II*, 545 U.S. at 241, 247; *Purkett*, 514 U.S. at 768.

### C. OCCA's Resolution of This Claim Does Not Preclude Merits Review Under § 2254(d)

#### 1. OCCA Unreasonably Applied *Batson* Under § 2254(d)(1).

OCCA unreasonably applied *Batson* under § 2254(d)(1). The court misstated step three of the inquiry, explaining: "[t]he State's race-neutral explanations for striking the panelist shifted the burden to Posey to prove purposeful discrimination." *Posey*, 548 P.3d at 1271. But no Supreme Court precedent finds that after the second step, the burden shifts *back* to the defendant to challenge the race-neutral reasons. Rather, step three always focuses on the *court*, which must consider "all of the relevant facts and circumstances" to determine "whether counsel's race-neutral explanation. . . should be believed." *Flowers*, 588 U.S. at 302; *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

To be sure, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. However, a court may not stop at step two and *must* go to step three to determine "the *persuasiveness* of the [race-neutral] justification[.]" *Id* (emphasis added). A trial and reviewing court must "consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers*, 588 U.S. at 302; *see also id.* at 303 ("An appeals court looks at the same factors as the trial judge[.]").

The difference here is subtle but crucial. OCCA treated step three as a determination of whether Posey's *response* cast enough doubt on the State's reasons to render them pretextual. Though OCCA stated, "We consider all the attendant circumstances[,]" its review focused entirely on Posey's comparison of Wright and Huntley. *Posey*, 548 P.3d at 1271. OCCA concluded the comparison "does not alone erode the legitimacy of the race-neutral explanation[.]" *Id.* But OCCA should not have considered the comparison "alone." OCCA had a duty to determine whether the State's reasons were credible considering *all the relevant facts,* including the State's failure to inquire about topics with which it was supposedly concerned, its misrepresentation of Wright's beliefs about the death penalty and her ability to be fair, and its acceptance of other jurors with similar characteristics. *Flowers* states plainly: a side-by-side comparison "cannot be considered in isolation[.]" *Flowers*, 588 U.S. at 314. A court "must examine the whole picture." *Id.* The whole picture makes clear that the State's reasons for striking Wright do not hold up.

### 2.    OCCA Unreasonably Determined the Facts Under § 2254(d)(2).

OCCA's decision to discredit the evidence comparing Wright and Huntley rested on

48

an unreasonable determination of the facts under § 2254(d)(2). OCCA found that the panelists "were not comparable," and that Huntley's "law enforcement background and exposure to the correctional system clearly differed from Wright's not only in terms of facilities but also responsibilities." *Posey*, 548 P.3d at 1271-72. But simply because Huntley and Wright's employment *differed* does not mean they are incomparable. A defendant "is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent." *Flowers*, 588 U.S. at 311-312 (emphasis in original). In fact, Huntley had significantly more law enforcement responsibility, from carrying a weapon and making arrests to training to become a police officer. While Wright worked on death row, her responsibilities were "just general correctional officer duties." Dkt. 19-5 at 1162. The State asked no meaningful questions about this role, nor did it identify why a juror with such experience would be undesirable, especially as Wright's background only made her more certain about the suitability of inmates' sentences.

Similarly, OCCA's comparison of Huntley and Wright's relatives omitted certain facts. For Huntley's brother, OCCA stressed the arrest occurred "ten plus years before and the charges were ultimately dismissed." *Posey*, 548 P.3d at 1272. But OCCA described Wright's nephews as "presently serving a twelve-year prison sentence" without noting the sentence was nearly complete, meaning the arrests occurred around the same time as Huntley's brother's arrest (over ten years ago). *Id*. Nor did OCCA address Wright's uncertainty as to the charge, though it emphasized that Huntley's brother had been arrested "so long ago" that Huntley "could not remember" details, even as the same applied to

Wright. [23] *Id*. This Court should apply *de novo* review and grant Posey habeas relief.

## IV.    THE TRIAL VIOLATED POSEY'S RIGHT TO DUE PROCESS AND A FAIR TRIAL BECAUSE JURORS OVERHEARD PREJUDICIAL AND INADMISSIBLE INFORMATION DURING BENCH CONFERENCES. [24]

### A.    Legal Standard

A criminal defendant is entitled to a guilt determination based solely upon evidence properly admitted in court. *Irvin v. Dowd,* 366 U.S. 717, 722–23 (1961). In a criminal case, exposure to extra-record evidence "about the matter pending before the jury is. . . deemed presumptively prejudicial[.]" *Remmer v. United States*, 347 U.S. 227, 229 (1954). In *Marshall v. United States*, 360 U.S. 310, 312 (1959), the Supreme Court granted a new trial in a criminal case where jurors were exposed to newspaper articles about the defendant's prior conviction despite jurors stating to the judge that they would not be influenced by the articles and would decide the case only on record-evidence. The Court so ruled because "prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. . . It may indeed be greater for it is then not tempered by protective procedures." *Id*. at 312-13. *Cf. Estes v. Texas*, 381 U.S. 532, 542-43 (1965) ("[A[t times a procedure employed by the State

---

[23] *See* Dkt. 19-5 at 1017 ("THE COURT: Okay. How long ago were they charged with those crimes? PROSPECTIVE JUROR WRIGHT: I'm not sure. I know they got 12 years and then both currently have 18 months left on that sentence").

These oversights demonstrate significant details in the record that OCCA failed to consider despite its mandate to assess "all of the relevant facts and circumstances" when determining whether a *Batson* violation exists. *Flowers*, 588 U.S. at 315.

[24] Posey will be returning to state court to exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

involves such a probability that prejudice will result that it is deemed inherently lacking in due process.").

## B.    Violation at Posey's Trial

Multiple times before and during Posey's trial, trial counsel requested a white noise machine to reduce the possibility of jurors overhearing inadmissible, prejudicial information during bench conferences. In October 2015, trial counsel filed a motion to use a sound barrier device during trial because the jury box was close enough to where side bars were conducted for jurors to overhear bench conference discussions. Dkt. 20-1 at 538-39. During a November 2015, motions hearing, counsel orally requested a white noise machine or other sound barrier. Dkt. 19-1 at 483-84. The court denied the defense request at an October 2018, hearing because the "sounds system at the courthouse does not have the capability of doing what was requested." *Id.* at 677-78. The court added it would revisit the request "if it's economical." *Id.* at 678.[25]  During voir dire proceedings, counsel informed the court, "It has been real clear, from the jurors' comments, that when we have a person up there, the jurors can hear everything that's going on. So—and that's a problem." Dkt. 19-4 at 735. Counsel pointed out, "we've had a couple of comments from the jurors, where they have said, oh, yeah, we hear what's going on." *Id.* The court agreed: "Yeah. I do remember one that said that. Yeah." *Id.*

The State also acknowledged that the jury could overhear the sidebar discussions. An Assistant District Attorney told the court, "Judge, briefly, I stepped out for reasons that

---

[25]  Trial counsel told the court during trial that "I don't think you can run [a white noise machine] through the sound system, but there are machines available." Dkt. 19-8 at 380.

I had to…I can hear every word that Mr. Solomon says. I was in the very, very back row, and during bench conferences, I could hear every single thing. So[,] I know that the jury can hear." Dkt. 19-4 at 738; Dkt. 19-8 at 379. Another prosecutor told the court that "I can hear everything that's been said back there." Dkt. 19-9 at 615.

The issue of jurors overhearing sidebar arguments pervaded Posey's trial. Over the course of the trial, the court held dozens of sidebar conferences. On nearly 40 separate instances, the Court specifically "shh'ed" counsel during bench conferences to prevent the jury from overhearing, not to mention the myriad other conference discussions clearly overheard by the jury. But the court never voir dired the jurors to understand the extent of their knowledge of what was discussed at bench conferences. Nor did the court determine whether the members of the jury had been prejudiced or make a sufficient inquiry into whether the impartiality of any juror had been destroyed. And trial counsel—despite arguing that the lack of a sound barrier at sidebars would prejudicially influence the jury and violates Posey's fair trial rights, *see* Dkt. 20-1 at 538-39—still did not request voir dire on the issue or any other corrective measures.

The record shows that trial counsel repeatedly requested a sound barrier or white noise machine to prevent the jury from overhearing side bar conversations, that jurors and witnesses could in fact overhear bench conferences, and that the bench conferences included discussions of prejudicial information. Despite knowledge that jurors were being exposed to extra-record information, the trial court did not appropriately investigate the jury or employ measures to protect Posey's constitutional rights. And, because the issue that the jury could hear the bench conferences arose repeatedly, the trial involved "such a probability

52

that prejudice will result" that it should be "deemed inherently lacking in due process." *Estes*, 381 U.S. 543. Posey's right to an impartial jury was violated, and as a result, his convictions and death sentences must be vacated.

## V.    POSEY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS. [26]

### A.    Legal Standard

To merit relief on an ineffective assistance of trial counsel claim, a petitioner must show: (1) deficient performance, "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688 (1984); and (2) prejudice, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### B.    Counsel Failed to Request a Stage 1 Voluntary Intoxication Instruction.

#### 1.    Introduction

Ample trial evidence showed Posey drank alcohol to the point where his senses were overcome on the night of June 15, 2013, and into the morning hours of June 16, 2013:

| | |
|---|---|
| 7:00 pm | Posey drank Coors Light during the 20-minute drive from his bunkhouse to a restaurant, Gilmore's Bar and Pub. Dkt. 19-10 at 391-394. |
| 7:20/7:30 pm | Posey, along with work colleague Josh Tilley, arrived at Gilmore's and each drank 8 to 10 beers during dinner. Dkt. 19-10 at394, 418. |
| 10:00-10:30pm | Posey and Tilley drove to Okarche, Oklahoma looking for the Hideaway Bar, but it was closed. Dkt. 19-10 at 395. They then drove |

---

[26] Only Subsection D.1 of this ineffective assistance of counsel Ground was presented below. Posey will be returning to state court to exhaust the unexhausted parts of this claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

|  | to the Silver Stallion bar in Mustang. Posey drank 5 to 6 beers on the drive to the Silver Stallion. Dkt. 19-10 at 418. |
|---|---|
| 11:30pm-1:45am. | After arriving at the Silver Stallion, Posey and Tilley drank at least 8 to 10 beers. Dkt. 19-10 at 418-419. Bartender Joshua Caldwell said Posey drank Bud Light for an hour, then had "several Jagers[27] and Jack Daniels,[28] and then switched back to beer until closing time. *See* Okla. St. Bureau of Invest. Rpt. No. 2013-787/46 (Att. 6). |
| 1:45 a.m. | Posey and Tilley left the Silver Stallion at closing time. *Id.* Posey slept during the ride back to bunkhouse. Dkt. 19-10 at 402. |
| 3:00 a.m. | Neighbor Ashley Ahlden saw Posey and Tilley pull up at the bunkhouse across from her trailer and saw them stumble on the way from Tilley's truck to the bunkhouse. Dkt. 19-10 at 441. Tilley stayed in the bunkhouse for about 15 minutes before leaving in his truck. *Id.* |
| 3:45 a.m. | Ahlden saw Posey stumble while going down the steps coming out of the bunkhouse. She then saw him sit in his truck for five minutes before driving off. Dkt. 19-10 at 441-442. |
| 5:00 a.m. | Michael Moore woke up and noticed "a tall boy, a Bud Light sitting next to the TV" in the living room. Dkt. 19-10 at 339. |
| 5:30 a.m. | Julian Maldonado testified that Posey looked hungover when getting dressed in work protective gear. Dkt. 19-11 at 70. |

The jury heard evidence of Posey's massive alcohol consumption and stupor-like behavior, yet Posey's trial counsel did not seek jury instructions on intoxication or the corresponding lesser included offense instructed upon where specific intent is lacking.[29]

---

[27] Jager is short for Jägermeister, a German liqueur 35% alcohol by volume.

[28] Jack Daniels is a brand of Tennessee whiskey.

[29] Oklahoma law requires a lesser included offense instruction of either second degree depraved mind murder or first-degree heat of passion manslaughter be provided to the jury when voluntary intoxication instructions are given. *See Grissom v. State,* 253 P.3d 969, 983 (Okla. Crim. App. 2011).

## 2.    Counsel's Deficient Performance

In Oklahoma,

> [v]oluntary intoxication instructions should be given when evidence has been introduced at trial that is adequate to raise that defense, i.e., to establish a prima facie case of voluntary intoxication, as that defense is defined under our law. As we have emphasized in the past and in regard to other affirmative defenses, "[t]he evidence of the defense may come from any source and should not be weighed by the trial court. The trial court should leave the weighing of the evidence to the finders of fact, in whose judgment our system of trial by jury is based.

*Malone v. State*, 168 P.3d 185, 196 (Okla. Crim. App. 2007).

A prima facie case of voluntary intoxication "requires that a defendant, first, be intoxicated and, second, be *so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent . . . element of the crime.*" *Grissom*, 253 P.3d at 983 (emphasis and ellipsis in original) (quotation omitted). Under Oklahoma law, voluntary intoxication may provide a partial defense to the specific intent crime of first-degree murder charged here. *Malone*, 168 P.3d. at 196; *Perryman v. State*, 159 P. 937, 938 (Okla. Crim. App. 1916).

Despite eliciting evidence from multiple prosecution witnesses establishing a prima facie case of voluntary intoxication, trial counsel failed to request appropriate jury instructions. The threshold for a voluntary intoxication instruction was clearly met in Posey's case, which should have prompted a reasonably competent advocate to seek appropriate intoxication and lesser included offense instructions. Trial counsel elicited the intoxication evidence from four prosecution witnesses at Posey's trial yet did not   request a voluntary intoxication instruction in Stage 1. Trial counsel has admitted that he had no

strategic reason for these failures. *See* Solomon Aff., ¶ 7 (Att. 7).

Counsel's investigation regarding intoxication evidence fell short as well. *Strickland* recognizes trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. Strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91. Objectively competent counsel would have sought to bolster the intoxication evidence with expertise. "When a defendant raises the defense of voluntary intoxication, an expert may properly offer his or her opinion on whether the defendant's actions were intentional." *Coddington v. State*, 142 P.3d 437, 450 (Okla. Crim. App. 2006).

But trial counsel did not utilize available expert assistance to bolster the need for such instructions. Undersigned habeas counsel have retained Oklahoma State University Pharmacology Professor Craig Stevens, Ph.D., who has reviewed the relevant trial testimony as well as collateral information regarding Posey's alcohol use on June 15-16. Dr. Stevens has concluded that Posey was intoxicated to the point that he could not form specific intent to kill because of his intoxication. *See* Stevens Rpt., at 8 (Att. 8). Estimating conservatively based on the trial testimony of the State's witnesses and applying sound scientific principles, Dr. Stevens concluded that Posey's blood alcohol concentration at the time of the fire around 4:00 a.m. would have been about 0.45%, which is almost six times the legal limit of driving while intoxicated (.08%). *Id.* at 3. Under *Coddington*, Dr. Stevens at trial "could have properly testified that, in his opinion and based upon his specialized knowledge, he believed [Posey] would have been unable to form the requisite deliberate

56

intent of malice aforethought." *See Coddington*, 142 P.3d at 450. This testimony would have furthered Posey's entitlement to a jury instruction in Stage 1 on intoxication negating specific intent. *See*, *e.g.*, *Malone*, 168 P.3d at 197 (expert testimony that Malone could not have formed the intent of malice aforethought plus evidence presented at trial "*on its face* [] established a prima [facie] case of intoxication" entitling Malone to a voluntary intoxication instruction) (emphasis in original).

### 3.    The Deficient Performance Prejudiced Posey in Stage 1.

Posey was entitled to intoxication and lesser included offense jury instructions, and a competent trial judge would likely give such instructions, with or without expert testimony. A diligent judge would be especially careful to do so in the context of a capital case. This is because failure to give such instructions where warranted is never harmless. *Beck v. Alabama,* 447 U.S. 625 (1980); *See Taylor v. Workman*, 554 F.3d 879, 893 (10th Cir. 2009). And *especially* had the expert evidence discussed herein been presented at trial, it is highly likely the trial court would have issued intoxication instructions, and accordingly a lesser-included offense of second-degree murder or first-degree manslaughter. *See Grissom*, 253 P.3d at 983-84. *Accord* Notes on Use, OUJI-CR 8-38 ("If the defendant presents sufficient evidence to raise the issue of intoxication, or if the evidence of the prosecution raises the issue of intoxication, the trial judge should instruct the jury on intoxication. . ..").

The standard instructions to which Posey was entitled would have informed the jury that: (1) the crime of first-degree murder has as an element the specific criminal intent of  malice aforethought; (2) a person is entitled to the defense of voluntary intoxication if

that person was incapable of forming the specific criminal intent because of his intoxication; (3) the State had the burden to prove beyond a reasonable doubt that Posey was not so intoxicated that he could not form the specific criminal intent to kill; and (4) if the jury found that the State failed to sustain that burden, by reason of Posey's intoxication, they had to find him not guilty of first-degree murder, a specific intent crime. *See* OUJI-CR 8-36, 8-38. *Accord Oxendine v. State*, 335 P.2d 940, 944 (Okla. Crim. App. 1958) (approving jury instruction to that effect). Had counsel requested the intoxication instructions to which Posey was entitled, there is a reasonable likelihood that the jury would not have convicted Posey of first-degree murder. In addition to the specific intoxication-related instructions Posey's jury would have received as detailed above, the trial court would also have been required to instruct the jury on the lesser included offenses of second-degree murder or first-degree manslaughter. *Grissom*, 253 P.3d at 983-84 (collecting cases).

### C. All Prior Counsel Failed to Ensure that the State Court Record Completely and Accurately Represented the Facts Surrounding Posey's Acquitted Tulsa Accusations the State Relied on in Stage 1.

#### 1. Deficient performance.

To the extent that trial counsel did not submit the relevant Tulsa transcripts, motions, and orders to supplement their pre-trial arguments detailed above, *supra* Ground I, trial counsel was deficient for not ensuring a complete record. To the extent OCCA held that appellate counsel's consent argument took priority over the actual State court record before them, then appellate counsel was ineffective for not relying on the existing state court record from the capital trial as well as for not making the relevant Tulsa records, which were in appellate counsel's files, part of the State court records.

58

2.   **Prejudice.**

But for trial and appellate counsel's ineffectiveness in not ensuring that OCCA had a complete and accurate record and understanding of Posey's prior Tulsa trial proceedings, there is a reasonable probability that OCCA would have conducted the correct *Ashe* analysis and ordered a new trial.

D.   **Counsel Failed to Adequately Investigate for, Prepare for, and Effectively Litigate at the Sentencing Stage.**

1.   **Counsel Failed to Present a Trauma Expert at Stage 2. [30]**

a.   **Introduction**

Though the defense's mitigation case centered on Posey's traumatic childhood, counsel failed to consult with and present a trauma expert who could explain the complex, multivariate effects of that trauma on Posey's development and functioning. Counsel went against the advice of defense neuropsychologist Antoinette McGarrahan—who had evaluated Posey at counsel's request—to retain and present a qualified expert to explain the impact of Posey's trauma. Instead, trial counsel only presented testimony from multiple lay witnesses who knew Posey as a child. While the witnesses presented the factual background of Posey's undisputed and well-documented childhood trauma, they understandably could not help the jury connect how the trauma and abuse Posey suffered affected his development, impacted his moral culpability or warranted a sentence less than death. In closing arguments, counsel was left with merely urging the jury to use their "common sense." Dkt. 19-15 at 689.

---

[30]   Posey raised this Ground as Proposition XI(A) on direct appeal.

The prosecution capitalized on this missing link between Posey's trauma and its impact on him to argue in closing that "[t]here was no witness who testified what the connection" between Posey's childhood and the commission of the crime was. *Id.* at 654-55, 660. The prosecution also urged the jury, "[A]sk yourselves how the upbringing impacts his moral culpability." *Id.* at 662. Had the jury heard from an expert who could have built on the lay witness testimony to make that connection, there is a reasonable probability that Posey would not have been sentenced to death.

### b. Counsel performed deficiently.

The Supreme Court has repeatedly emphasized that capital counsel's failure to conduct a reasonable mitigation investigation is deficient performance. *See Sears v. Upton*, 561 U.S. 945, 951-52 (2010); *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005); *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000). The "focus [is] on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the client's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 510 (emphasis in original); This Court is "compelled to insure the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (quoting *Lockett v. Ohio*, 438 U.S. 586, 602 (1978)).

Here, counsel had no reasonable basis for failing—against his own mental health expert's recommendation—to thoroughly investigate the impact of Posey's trauma by

consulting with, retaining, and presenting a qualified trauma expert, because Posey's traumatic upbringing was the central theme of the defense's mitigation case. While lay witnesses can recount challenging life experiences and/or the symptoms and behaviors they observed, only an expert—building upon the factual history developed by lay witnesses—can explain the effects of life experiences on an individual's functioning and behavior. *See* Minagawa Aff., ¶ 19 (Att. 9);[31] Teicher Rpt. at 5 (Att. 11); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 10.11(F) (2003); Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407, 410 (2014).

Counsel had a duty to make reasonable investigations. *Strickland*, 466 U.S. at 691. But here, counsel's investigation was inadequate because they "ignored pertinent avenues for investigation of which [they] should have been aware." *Porter*, 558 U.S. at 40; *see also Rompilla*, 545 U.S. at 391 n.8 (counsel cannot ignore "red flags" for mitigation). Counsel was, in fact, aware of the need for a trauma expert, as their neuropsychologist advised them to seek one. Minagawa Aff. ¶ 2; Solomon Aff. ¶ 8. It is unclear whether defense counsel contacted Dr. Minagawa mere months before the trial began—after trial counsel had represented Posey for about five years—and was told that Dr. Minagawa was unavailable on that timeline, as counsel now asserts, s*ee* Solomon Aff. ¶ 8,[32] whether counsel simply failed to seek a trauma expert as Dr. Minagawa states, Minagawa Aff. ¶3, or whether, if Dr.

---

[31] Posey pled Dr. Minagawa's report in State direct appeal proceedings. Dkt. 20-5 at 411.

[32] There is no contemporaneous documentation of a conversation between trial counsel and Dr. Minagawa.

Minagawa was indeed unavailable, counsel then followed up with an expert who was "equipped by professional training or experience to offer [relevant] testimony." *Littlejohn v. Trammell*, 704 F.3d 817, 866 n. 25 (10th Cir. 2013). Regardless, counsel breached their duty when they "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 528. Counsel's "decision to end their investigation when they did was neither consistent with the professional standards that prevailed in [2019, at the time of trial]," *id.* at 534, nor reasonable given Dr. McGarrahan's recommendation, which "would have led a reasonably competent attorney to investigate further," *id.* Given the importance of explaining to the jury how the undisputed and well-documented history of abuse and neglect that Posey suffered affected his moral culpability for both the alleged crime and aggravating circumstances, any reasonable counsel would have retained and presented a qualified trauma expert at sentencing.

Trial counsel's failure to present a trauma expert was likely "the result of inattention," or disorganization and neglect, rather than "reasoned strategic judgment." *Id.* Indeed, trial counsel understood that the question of whether Posey's trauma could be connected to the alleged crime called for expert testimony. Dkt. 19-15 at 214-18 (defense objected to line of questioning in prosecution's cross-examination of witness on the grounds that it called for expert opinion). Counsel's failure to present a trauma expert left a significant gap in the defense's mitigation case. Defense counsel could only argue in closing that jurors use their common sense to understand why Posey's childhood of abuse and neglect mattered: "[W]e all know that when you damage your kid to the point that he was

damaged, there are going to be effects. You-all have seen it in your own lives. You've known kids who are so damaged by their parents that they—they were damaged adults." Dkt. 19-15 at 689. Counsel further urged, though they had not offered any witness in support of this claim, that "[t]here are a number of educators who work with kids, who have kids, know when those informative [sic] years are and know patterns that are laid down there, for the patterns that go with them through their life." *Id.* at 718-19. As explained below, and as the capital defense community understood at the time of trial, the effects of trauma are complex and not common sense. Testimony from a trauma expert would have built upon the lay witness testimony and provided the jury a framework to interpret the factual evidence and properly weigh it. Defense counsel has since admitted that the defense did not give the jury the tools "to understand what impact that trauma had on Mr. Posey without hearing from an expert such as Dr. Minagawa on the developmental effects of childhood trauma." Solomon Aff. ¶ 9.

### c.    Counsel's performance prejudiced Posey.

The Supreme Court has held that evidence of childhood poverty, abuse, and neglect are highly relevant to the question of moral culpability. *Williams*, 529 U.S. at 398; *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). The Tenth Circuit, too, has noted that the importance of this type of evidence "cannot [be] overstate[d,]" *Anderson v. Sirmons*, 476 F.3d 1131, 1147-48 (10th Cir. 2007), because such evidence "humanize[s]" the defendant and can provide a "compelling *explanation* for [a defendant's] behavior[.]" *Smith v. Mullin*, 379 F.3d 919, 943, 944 (10th Cir. 2004) (emphasis in original).

63

In Posey's state post-conviction proceedings, Dr. Minagawa detailed the readily-available testimony a trauma expert could have provided to the jury if counsel asked them:

- Posey's documented history of abuse and neglect started from the time he was seven or eight years old, was extensive, and continued for at least seven years. The abuse and neglect would have negatively impacted not only his emotional development, but also his physical development, especially in terms of neural development.

- The multiple traumas Posey experienced resulted in a condition called complex trauma, which had a profound effect on him in terms of attachment (his ability to relate to others), biology (interfering with normal brain development), affect regulation (being unable to control his feelings of anger, sadness, and anxiety), behavioral control (getting into trouble at school and the community), and cognition (difficulties in executive functioning, and problems with planning and anticipation).

- Early severe stress and maltreatment produces a cascade of neurobiological events that have the potential to cause enduring changes in brain development. Even psychological abuse can have detrimental effects on brain function that are not only long lasting but that may alter patterns of subsequent neurodevelopment.

- Complex trauma exposure results in a loss of core capacities for self-regulation and interpersonal relatedness. Children exposed to complex trauma often experience life-long problems that place them at risk for additional trauma exposure and cumulative impairment (e.g., psychiatric and addictive disorders, chronic medical illness, legal, vocational, and family problems). These problems can extend from childhood through adolescence and into adulthood.

- Posey's experiences as a child and adolescent would directly affect the way he perceived the world, impact his decision-making abilities as an adult, and impair his ability to control his emotional response in stressful situations.

- The impact of trauma on developing brains include problems with decision making, emotional reactivity, and cognitive distortions. These changes are not fully under the control of the individual.

- Posey's love/hate relationship with his mother is not an uncommon phenomenon in victims of parental abuse. His attempts to earn love from his mother, as documented in the records, is a manifestation of complex trauma.

- Posey could not escape the abuse and neglect he suffered at home based on his age and lack of resources. Based on a review of the records, he was not provided with the mental health services needed to address his history of abuse and neglect.

Minagawa Aff. ¶ 19.

Moreover, a trauma expert could have explained to the jury how "the cascade of

problems [Posey] demonstrated in childhood that worsened in his adolescence[,]" including certain juvenile allegations that the State presented at penalty phase, "must be understood in the context of severe [childhood] stress and its impingement on [Posey's] normal development." Porterfield Rpt. at 18 (Att. 10); *id.* at 20 (deteriorated functioning in adolescence included poor emotional regulation and impulse control, anxiety, and impaired self-esteem). A trauma expert also could have testified to the manifestations of complex childhood trauma on Posey as an adult. Undersigned counsel retained Dr. Katherine Porterfield, a licensed clinical psychologist specialized in child psychology and the assessment and treatment of childhood trauma, to evaluate Posey. Dr. Porterfield concluded that Posey's impairments as an adult, including emotional numbing, impaired ability to discuss traumatic events, and blocked memory, are strongly linked to the deleterious impact of neglect and abuse during his childhood development. *Id.* at 18.

Ultimately, without this evidence, the prosecution capitalized on the "limited nature of trial counsel's case in mitigation" to "argue convincingly to the jury that there was nothing in the case to diminish [Posey's] moral culpability for the murders." *Anderson*, 476 F.3d at 1147. In closing statements, the prosecution argued, "I kept hearing two different things from the various witnesses. Vanita, bad mom. Derek, good guy." Dkt. 19-15 at 654. The prosecution claimed it was a "contradiction" to say that "Vanita's parenting contributed to the commission of this crime." *Id.* at 654-55, 660. They argued, "How that is, I'm not clear on. There was no witness who testified what the connection is." *Id.* at 654-55. They urged the jury: "[A]sk yourselves how the upbringing impacts his moral culpability." *Id.* at 662. The prosecution noted that Posey had been away from his mother for about 16 years

before the murder and posited, "Shouldn't he have been out from under her shadow by that time?" *Id.* at 660. They also appealed to common misconceptions of abusive relationships to cast doubt on Posey's trauma: "If Vanita's really responsible, what is up with spending Mother's Day with her a month before the murders? Sound like the relationship of torture and abuse that it was made out to be?" *Id.* at 662-63.

Testimony from a trauma expert was crucial in this case. **First**, without it, jurors fell into a "but their fine" reasoning trap: "observing *individual* cases of resilience and concluding that maltreatment effects *must therefore not be serious, widespread, or scientifically valid*." Teicher Rpt. at 3 (emphasis added). The State exploited this notion, arguing to the jury that Posey's twin brother, who was similarly abused, turned out "okay." Dkt. 19-15 at 662. As psychiatrist Martin Teicher, an expert in the effects of childhood maltreatment on brain development, explains, lay jurors cannot be expected to understand, without expert guidance, why some individuals are resilient while others are severely affected, because that requires expertise in gene-environment interactions, developmental psychopathology, and the neurobiology of stress. Teicher Rpt. at 3; *see also* Porterfield Rpt. at 19 ("The impact of childhood stress and trauma on a person's development is complex and multivariate. That is, there is not 'one way' that people are impacted[.]"). Lay jurors also may fail to appreciate that the existence of resilient individuals does not negate population level effects. *Id.* Moreover, childhood trauma effects can be highly domain-specific—i.e., an individual may experience significant difficulties in certain domains, like emotional regulation, interpersonal relationships, physical health, or stress reactivity, while achieving success in other domains, like professional development—which lay jurors would

not know without expert guidance. *Id.*

Nor are the mechanisms through which childhood maltreatment alters brain development common knowledge. *Id.* at 4. Specialized expertise is needed to explain the specific neural circuits affected by trauma, the sensitive periods during which different brain regions are vulnerable, and the ways different types of maltreatment target different neural systems. *Id.* Finally, different forms of maltreatment occurring at different developmental stages produce different neurobiological effects through different mechanisms. *Id.* None of these principles or research-based findings is common knowledge but instead require expert explanation.

**Second**, the prosecution's arguments that Posey should "have been out from under [his mother's] shadow by [the] time" of the alleged crime seized on another commonsense trap—the "get over it" fallacy. Dkt. 19-15 at 41; Teicher Rpt. at 4. The "get over it" fallacy is the idea that "this happened a long time ago, get over it." *Id.*. This misconception reflects a fundamental misunderstanding of how early adversity affects the developing brain: "Unlike psychological memories that may fade with time or emotional wounds that may heal, maltreatment during sensitive periods of brain development creates structural and functional alterations in neural architecture." *Id.*

For example, Posey suffered physical abuse for several years starting from age seven or eight. Minagawa Aff., ¶ 9(a). Dr. Teicher explains that while lay witnesses can establish that physical abuse occurred, an expert is necessary to explain that the ages six through ten represent a sensitive period for development of the cerebellar vermis, a brain structure involved in emotional regulation and impulse control. Teicher Rpt. at 12; *see also*

Minagawa Aff., ¶ 9(a). Physical abuse during this period produces measurable reductions in vermis volume and altered connectivity between the cerebellum and limbic emotional centers. *Id.* The functional consequence is specific deficits in modulating emotional responses and inhibiting motor responses under emotional arousal that last into adulthood. *Id.*; *see also id.* at 4 ("[N]eural architectural differences persist into adulthood and fundamentally affect how the individual processes emotions, regulates stress responses, controls impulses, and makes decisions under pressure. *Id.* Individuals cannot simply get over having different brain architecture.").

**Third**, expert testimony was essential to explain how childhood maltreatment produces pervasive functional impairments in domains directly relevant to legal questions of culpability, including trust and interpersonal functioning, emotional regulation, impulse control, and judgment and decision-making. *Id.* at 9.

Because counsel failed to consult with and present an expert in childhood development and trauma, the jury was left without a meaningful framework to understand and assign proper weight to the evidence of Posey's childhood maltreatment. That failure prejudiced Posey. There is a reasonable probability that "[h]ad the jury been able to place [Posey's] excruciating life history on the mitigating side of the scale, . . . at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### d.    OCCA's Resolution of this Claim Does Not Preclude Merits Review Under 28 U.S.C. § 2254(d).

#### (1)    OCCA was Unreasonable Under § 2254(d)(1).

**First**, OCCA's assertions that counsel made an "informed choice"—against Dr.

McGarrahan's recommendation—to pursue lay witness testimony rather than that of an expert, and that the same was "sound," "deliberate," and "reasonable" trial strategy, was an unreasonable application of clearly established federal law. *E.g.*, *Posey*, 548 P.3d at 1282, 1283. The Supreme Court has admonished that trial counsel's decisions are reasonable only if "the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 522-23 (emphasis in original). Here, the known evidence of Posey's adverse childhood, coupled with Dr. McGarrahan's recommendation, "would lead a reasonable attorney to investigate further." *Id.* at 527; *see also Porter*, 558 U.S. at 40 (granting habeas relief where counsel "ignored pertinent avenues for investigation of which he should have been aware"). By failing to investigate further and properly consult with a trauma expert, counsel "abandon[ed] their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28; *see also Sears*, 561 U.S. at 954 n.10 ("[T]he reasonableness of the [defense mitigation] theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory.").

**Second**, the state court ruling was contrary to, or an unreasonable application of, clearly established federal law, because OCCA placed undue emphasis on the purported double-edged nature of Posey's trauma. OCCA found that counsel made a strategical decision not to call a trauma expert because "[t]oo much emphasis on Posey as permanently traumatized from his mother's abuse and neglect may very well have backfired[.]" *Posey*, 548 P.3d at 1282. But the possible introduction of damaging evidence does not justify the

failure to introduce comparatively significant mitigative evidence. *See Williams*, 529 U.S. at 396. Further, when the jury has already heard the aggravating edge of evidence, it is unreasonable not to present the mitigating edge. *See Smith*, 379 F.3d at 943 and n.11.

**Third**, multiple times, OCCA applied the incorrect standard for prejudice under *Strickland* by requiring Posey to show that the outcome of the proceedings "would have" been different, rather than a reasonable probability of a different outcome. *See e.g.*, *Posey*, 548 P.3d at 1283 (Posey failed to show that expert testimony "*would have caused* the jury to . . . sentence him to life in prison rather than death) (emphasis added); *id.* (expert testimony "would not have appreciably altered" balance of penalty phase evidence). OCCA supplanted *Strickland's* standard with a preponderance-of-the-evidence standard—a paradigmatic example of a ruling that is "contrary to" clearly established federal law under § 2254(d)(1). *Williams*, 529 U.S. at 405-06 (preponderance standard is "'diametrically different'" from standard clearly established by precedent).

### (2)    OCCA was Unreasonable Under § 2254(d)(2).

**First,** OCCA speculated several theories for why counsel failed to call a trauma expert to explain the impact of Posey's traumatic childhood and adolescence on him. *Posey*, 548 P.3d at 1282-83. However, there is no support in the record for those theories. Rather, like in *Wiggins*, "the 'strategic decision[s]' the state court[]. . . invoke[d] to justify counsel's limited pursuit of mitigating evidence resemble[d] more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-27.

For example, OCCA found that counsel made a strategic decision not to present a

70

trauma expert for fear that the prosecution would cross-examine any expert on Dr. McGarrahan's findings, which OCCA characterized as "unhelpful." *Posey*, 548 P.3d at 1282. The court was apparently alluding to a statement in Dr. Minagawa's affidavit that Dr. McGarrahan did not find intellectual disability or "extensive mental health issues." [33] Minagawa Aff. ¶ 2.

This finding was unreasonable for two reasons. First, there is simply no evidence in the record to suggest that fear of cross-examination was a part of trial counsel's deliberations. Dr. McGarrahan did not prepare a report or testify at trial so there would be no reason for the State to know about Dr. McGarrahan and cross-examine a trauma expert on her findings. Second, the state court drew unreasonable factual conclusions from Dr. Minagawa's comment. Even if Dr. McGarrahan did not find intellectual disability or "extensive mental health issues," that result is a far cry from "unhelpful." *See Posey*, 548 P.3d at 1282. Mitigation has never been cabined to intellectual disability and extensive mental health issues. Just the opposite—mitigation must extend to all aspects of a defendant's character and record and to circumstances of the offense proffered in mitigation. *Lockett*, 438 U.S. at 605, 608. Relevant mitigation therefore encompasses other impairments, besides intellectual disability, as well as mental health issues like neurological impairments and trauma. *See id.* A defendant may have a trauma history regardless of

---

[33] To be clear, OCCA characterized Dr. McGarrahan's findings as "unhelpful"—not trial counsel, appellate counsel, or Dr. Minagawa, who was retained by appellate counsel. Nor is there any record support for OCCA's characterization. To the contrary, counsel knew from Dr. McGarrahan that Posey had multiple neurological issues, including memory issues, which is connected to childhood abuse, and head trauma.

whether he is intellectually disabled or has other severe mental health conditions. And as OCCA acknowledged, Dr. McGarrahan recommended that trial counsel consult a trauma expert. *Posey*, 548 P.3d at 1282. That recommendation would be futile if her findings undermined any trauma diagnosis.

**Second,** OCCA also elaborated: "Trial counsel knew the prosecution would cross-examine any child development psychologist about neuropsychological testing and mental health issues associated with victims of abuse and neglect which did not weigh in Posey's favor." *Id.* According to OCCA, "[t]he expert would either have to disclose, if known, the results of Dr. McGarrahan's testing or plead ignorance and risk looking inexperienced and possibly incompetent." *Id.* As an initial matter, a trauma expert is not an expert on interpreting neuropsychological testing, and cross-examination on such testing would not reveal inexperience or incompetence. Moreover, had trial counsel sought a trauma expert, that expert would have conducted her own trauma evaluation; her opinion would not merely be based on the results of Dr. McGarrahan's neuropsychological testing. A trauma expert can reach opinions independent of the results of neuropsychological testing. Again, for that reason, that Dr. McGarrahan did not find intellectual disability or severe mental illness would not impeach a trauma diagnosis. In sum, OCCA took Dr. Minagawa's comment out of context, interpreted it to militate *against* retaining a trauma expert—even though *both* Dr. Minagawa and Dr. McGarrahan believed a trauma expert *was necessary*—and attributed this flawed reasoning to counsel. *See id.* at 1282-83. The record does not support such speculative "*post hoc* rationalization." *Wiggins*, 539 U.S. at 526-27.

**Third**, OCCA made another unreasonable factual determination in finding that

72

"[c]ounsel chose to present evidence of Posey's childhood and adolescence through witnesses who personally interacted with him and related firsthand testimony of his circumstances *rather than* Dr. Minagawa's sterile textbook conclusions gleaned from various records, police reports, interview materials, and trial transcripts of the proceeding." *Posey*, 548 P.3d at 1282. Nothing in the record suggests that counsel believed they had to make a binary choice between lay or expert witness testimony or that they considered the effectiveness of lay witness testimony compared to that of an expert witness. Certainly, that was not the ineffectiveness claim that OCCA had before it, which was based on counsel's failure to call a trauma expert to contextualize the factual foundation developed by lay witnesses. [34] Dkt. 20-5 at 381-94. Again, OCCA's conclusion, without record support, "resembles more a *post hoc* rationalization of counsel's conduct" rather than a reasonable determination of the facts. *See Wiggins*, 539 U.S. at 526-27.

**Fourth**, OCCA unreasonably found that expert testimony would have been inconsistent with the rest of the defense's mitigation case, which focused on how Posey was a kind and compassionate person. *Posey*, 548 P.3d at 1282. To the contrary, testimony from a trauma expert would not have been inconsistent with the arguments counsel was already

---

[34] Nor would such a binary choice make sense. "It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact." Stetler, 82 UMKC L. Rev. at 410. For decades, capital defense practitioners have understood that "[l]ay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe"; instead, "only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to offer an empathic framework for understanding the resultant disorders and disabilities." *Id.* In other words, prevailing professional norms recognized that "expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life shaped the capital client's brain and behavior." *Id.* at 411.

making. Indeed, the defense presented evidence of Posey's trauma and argued that he was a "damaged adult[]" with "perns . . . laid down" in his "formative years" as a result. Dkt. 19-15 at 689, 718-19. But the defense had no expert testimony, and therefore no evidence, drawing the connection between Posey's childhood maltreatment and its lifelong consequences, thus allowing the jury to give the mitigating evidence proper weight. Expert testimony would only have supported the arguments counsel was advancing.

### 2.   Counsel Failed to Present Evidence that Posey is Brain Damaged.

Objective, standardized testing shows that Derek Posey has long-standing brain damage. Trial counsel knew—or should have known—that, at the time of the offense, Posey's brain dysfunction impaired his judgment, reasoning, and decision-making. But counsel still did not tell the sentencing jury about Posey's brain damage, which was not only highly mitigating but also undercut the State's continuing threat aggravating factor. Trial counsel was ineffective for failing to reasonably investigate and present the readily available evidence that Posey suffered from brain dysfunction. Appellate and post-conviction counsel were ineffective for not litigating trial counsel's ineffectiveness.

### a.   Trial Counsel's Deficient Performance

It is well-settled that trial counsel representing a brain-damaged capital defendant should ensure that the sentencing jury learns that fact. *See, e.g., Sears,* 561 U.S. at 949 (finding deficient performance for not presenting psychological testing results indicating "that [defendant] had substantial deficits in mental cognition and reasoning"); *Porter,* 558 U.S. at 36, 41 (finding deficient performance for failing to present evidence that "psychological assessments" revealed that defendant had a "brain abnormality," which is

the "kind of troubled history. . . relevant to assessing a defendant's moral culpability").

Here, trial counsel knew from a pre-trial expert neuropsychological evaluation that Posey had visual and verbal memory problems, which is a known red-flag for brain damage. Counsel also knew that Posey had suffered head injuries and had been abused and deprived throughout his childhood, both of which can impair brain development. *See* Minagawa Aff.; Hunter Rpt. (Att. 17); Porterfield Rpt.; Teicher Rpt. Yet, trial counsel did not follow-up by fully investigating, developing, and presenting evidence of Posey's long-standing neurological impairments.

In "assessing the reasonableness of an attorney's investigation," a court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Thus, counsel cannot reasonably ignore "red flags" or "pertinent avenues" for investigation about which counsel knew or should have known. *Rompilla*, 545 U.S. at 391 n.8; *Porter*, 558 U.S. at 40. Here, trial counsel acted deficiently because they failed to follow up on red flags calling for further investigation into Posey's brain impairments. Trial counsel had no strategic reason for this failure. Had counsel presented evidence of Posey's brain damage, it would have complemented the lay trauma evidence presented, would have bolstered counsel's claim that Posey would not be a threat if sentenced to life imprisonment, and would have countered the State's continuing threat assertion.

The Tenth Circuit has described capital trial counsel's obligation regarding presentation of "powerful" brain damage evidence in the penalty phase:

> [W]here there are credible, reasonably discernable clues that a capital

> defendant's circumstances will support a mitigation theory based on organic brain damage, it is at the core of a defense counsel's constitutional responsibilities . . . , ordinarily, to present such evidence to the jury. . ..

*Littlejohn*, 704 F.3d at 860 n.23. The Court further noted that, "[b]ecause of [brain damage's] central significance . . . , ordinarily it would be 'patently unreasonable for [counsel] to omit this evidence from [the] case for mitigation.'" *Id.* at 860 (quoting *Smith*, 379 F.3d at 942). Trial counsel had a core constitutional responsibility to inform Posey's sentencing jury about his brain damage. The "patently unreasonable" omission constituted deficient performance.

### b.      Trial Counsel's Deficient Performance Prejudiced Posey.

Evidence of a capital defendant's brain damage has a powerful mitigating effect "for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks v. Workman,* 689 F.3d 1148, 1205 (10th Cir. 2012). Trial counsel's failure to present Posey's brain dysfunction to his jury prejudiced Posey because trial counsel could have "sketched a more sympathetic figure of [Posey], one less deserving of death." *Id*.

Neuropsychologist Scott Hunter conducted a comprehensive neuropsychological evaluation of Posey at undersigned counsel's request. Dr. Hunter found that Posey was significantly impaired in his executive functioning: he had verbal and visual memory weaknesses consistent with those found by trial counsel's expert pre-trial; had difficulties with complex problem solving, reasoning, and decision-making; and showed vulnerabilities in responding to new information and acting accordingly. *See* Hunter Rpt. at 2, 14, 22. Dr.

76

Hunter found that Posey's brain impairments were long-standing. *Id.* at 2, 23. Trial counsel's failure omission of such expert testimony detailing Posey's brain damage evidence prejudiced Posey in several ways.

**First**, brain dysfunction evidence in and of itself provides powerful support for a life sentence, as the Supreme Court and the Tenth Circuit have repeatedly found. In *Porter,* the Supreme Court relied on post-conviction neuropsychological test results showing the defendant's "brain abnormality" to find prejudice because the evidence "would [have] humanize[d] Porter [and] allow[ed] the [jury] to accurately gauge his moral culpability." 558 U.S. at 41. The Supreme Court likewise relied on post-conviction neuropsychological testing showing "organic brain damage" and "significantly impair[ed]. . . cognitive functions" as part of a *Strickland* prejudice finding in *Rompilla,* 545 U.S. at 392. Most recently, in *Sears,* the Supreme Court held that "[a] proper" prejudice analysis must "take[] into account" the defendant's "significant frontal lobe abnormalities" as revealed on psychological tests. 561 U.S. at 956.

The Tenth Circuit has found similarly. In *Smith v. Mullin,* the Court relied on postconviction neuropsychological testing showing brain damage in finding prejudice because that "is exactly the sort of evidence that garners the most sympathy from jurors." 379 F.3d at 942. The *Smith* Court supported its conclusion with reference to empirical studies indicating that capital juries are persuaded by evidence such as "organic brain problems." *Id.* In *Anderson v. Sirmons,* the Court found prejudice based on neuropsychological testing showing brain damage to the frontal lobe, the area of the brain that "affect[s]. . . reasoning, problem solving and judgment." 476 F.3d at 1147. The Court

77

"c[ould] not overstate the importance" of presenting frontal lobe brain dysfunction because such evidence "serves to humanize a defendant and explain why an otherwise kind and loving family man can come to participate in a violent, murderous event." *Id.* Again relying on neuropsychological showing brain damage, *Hooks v. Workman* found prejudice where such evidence would have "diminish[ed] [the defendant's] moral culpability," "humaniz[ed], . . . explain[ed] [and] individualize[d]" the defendant. 689 F.3d at 1205, 1207; *see also Littlejohn,* 704 F.3d at 864 ("[e]vidence of organic mental deficits ranks among the most powerful types of mitigation evidence available").

**Second**, an expert such as Dr. Hunter could have testified about how Posey's brain dysfunction "had a significant impact on Derek [Posey's] ability to weigh and deliberate, and to respond rationally and regulate his emotional and behavioral impulses, at the time of the crime." Hunter Rpt. at 23. Such expert testimony would have explained why he "c[a]me to participate in a violent, murderous event." *Anderson,* 476 F.3d at 1147. By "connect[ing] the dots," *Hooks*, 689 F.3d at 1204, between the impairment and the crime, the brain damage evidence would have had even more potency in the jury's sentencing calculus.

**Third**, presenting Posey's brain dysfunction to the sentencing jury would have added substantial weight to the defense argument that Posey would be well-behaved if sentenced to life imprisonment. An expert could have testified that the "structure that is provided by prison . . . sustain[s] [Posey] in his capacity to control and mediate demands and challenges typically encountered in daily life." Hunter Rpt. at 23. Trial counsel could have shown that the brain impairment-based judgment problems Posey exhibited in the community would be controlled in prison had they developed expert testimony discussing the regulating effect

of a structured setting on Posey's brain impairments. This opinion would have been corroborated by "what the OJA workers told you while he was in custody, he flourished. He does well in a structured environment, and well at that time. He put on weight. He brightened up." Dkt. 19-15 at 688-89; *accord* Hunter Rpt. at 23. But because of counsel's deficient performance, the defense was left to argue in closing that Posey's "behavior in the county jail . . . [is] the only evidence you have about how he's going to be in the future." Dkt. 19-15 at 714. Given that the jury unanimously found continuing threat, the defense presentation on future behavior was patently insufficient and would have been strengthened by empirical evidence of Posey's brain damage.

**Fourth**, presenting brain damage evidence supporting that Posey would make a positive adjustment to prison life also would have refuted the prosecution's continuing threat argument. At trial, the prosecution introduced extensive evidence to attempt to prove this aggravator. The prosecution then argued that Posey would be a future danger in prison if not given a death sentence:

> [W]here do these lines of sex crime and violent crime converge? . . That's the trajectory he's been on since age 14. *Exactly what have you been given to let you believe that it would stop now?* A probability that it would continue in the future. . . Objects in motion stay in motion, right? What exactly more evidence could there be that he represents a continuing threat to society? *Again, what evidence has there been that we're done now, that this would stop now*?

NT 6/6/19 at 28 (emphasis added). An expert could have easily answered the questions posed by the State and explained that past is not prologue, particularly for brain-impaired persons like Posey in the structured prison setting.

Additionally, trial counsel had no response to the State's attempt to portray Posey as

manipulative, especially with prison guards. *See* Dkt. 19-15 at 458; *id.* at 664 (State arguing that jail witness "admitted finally that [Posey] had charmed the jail staff . . . Charming and charismatic when he needed to be, to get what he wants, from start to finish."). *Cf.* Dkt. 19-7 at 22 (State arguing that "Posey is a man who tries to get what he needs from people by charm, by being charismatic and larger than life. when that fails, he's not above taking what he wants."). But competent counsel could have used Posey's brain damage to counter the State's characterization. *See, e.g., Littlejohn,* 704 F.3d at 867 ("the continuing-threat aggravator . . . could have been diminished significantly by evidence of a treatable organic brain disorder"); *Anderson,* 476 F.3d at 1144 ("Anderson's brain deficits affect his reasoning, problem solving, and judgment. These deficits can be perceived by lay persons as . . . antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system.").

**Fifth**, trial counsel's decision to present nearly 20 witnesses, *Posey*, 548 P.3d at 1281 n.40, and make extensive argument, Dkt. 19-15 at 699-700, 706-10, about Posey being an "all around good and respectful human being," *Posey*, 548 P.3d at 1283, without also incorporating his brain damage into the mitigation case was particularly prejudicial because such "good guy" evidence does nothing to explain "how [a] kind and considerate person could commit such a horrendous crime, although mental health evidence providing such an explanation was at [counsel's] fingertips." *Smith*, 379 F.3d at 939-40. When a kind capital defendant also has neurological impairments that explain the criminal behavior, trial counsel's failure to present that brain damage evidence is prejudicial. And not only was the "nice guy" evidence unhelpful without explanation but also it was undercut by the State's

80

misleading manipulation argument that "[n]o one who testified about how great he was knew the things he had done, because he controlled the narrative about himself, twisting the facts, denying the facts or simply hiding them." Dkt. 19-15 at 666.

Overall, expert testimony about Posey's long-standing brain dysfunction would have humanized him, explained his behavior and decision-making at the time of the crime, would have bolstered the mitigation argument regarding Posey's good future prison conduct, would have undermined the continuing threat aggravating factor the jury found, and would not have harmed the mitigation case. Had trial counsel made such a presentation, there is a reasonable probability that at least one juror would have voted for a life sentence.

### 3. Counsel Failed to Argue Posey's Intoxication as Mitigation.

In Stage 2 counsel did not present Posey's intoxication as a mitigating circumstance or include it in the list of mitigating circumstances in the jury instructions. Counsel had no reason not to do so. *See* Solomon Aff, ¶ 7.

### 4. Counsel Failed to Present Available Witnesses on Future Conduct.

To support that Posey would not pose a danger if sentenced to life, trial counsel called two jail guards to testify that Posey had not caused problems, followed the rules, and was trusted by jail staff during his nearly six years of pre-trial detention. Dkt. 19-15 at 10, 22-24, 439, 445. Still, the jury unanimously found the continuing threat aggravator, which required the State to "prove[] beyond a reasonable doubt . . .  a probability that [Posey's] threat[ening behavior] will continue to exist in the future." Dkt. 19-15 at 632. Given the importance the State placed on this aggravator, trial counsel had no reason not to call additional jailers who could have bolstered the defense argument that Posey would not be a

81

future threat. Dkt. 19-15 at 713-14. For instance, counsel could have called David Gepner, who would have testified that Posey "was the calmest and most levelheaded inmate I have ever met. He was always respectful. . . [and] followed all the jail's rules. . .." Gepner Aff., ¶ 6 (Att. 12). The testimony of additional corrections officers regarding Posey's good prison adjustment, as well as testimony from an expert regarding the favorable effects of the rigid structure of prison on individuals with brain damage, would have been a significant upgrade, in terms of quality and quantity, over the limited evidence counsel did present, and would have created a reasonable probability at least one juror would have "drawn favorable inferences . . . regarding [Posey's] character and his probable future conduct if sentenced to life in prison," *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), and voted for a life sentence.

### 5. Counsel Failed to Fully Investigate and Rebut the State's Assertions in Support of the Continuing Threat Aggravator.

The State spent two days presenting witnesses for its continuing threat aggravator. Dkt. 19-14 at 291-612. Trial counsel had a duty to respond to the State's case. *Rompilla*, 545 U.S. at 385. Numerous available witnesses could have undermined the State's claims. *See* Bruns Aff. (Att. 13); Gouldsby Aff. (Att. 14); Stallsworth Aff. (Att. 15); Mendenhall Aff. (Att. 16). Given the centrality of this aggravator to the State's sentencing presentation—as well as its argument for death, Dkt. 19-15 at 643-47, 663-64—there is a reasonable probability at least one juror would have voted for life if trial counsel had fully investigated and responded to the State's allegations.

### 6. Cumulatively, Counsel's Failures Prejudiced Posey.

In assessing *Strickland* prejudice, a court must "consider the totality of the available

mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter,* 558 U.S. at 41 (quoting *Williams v. Taylor,* 562 U.S. 362, 397-98 (2000)). Here, trial counsel's Stage 2 omissions prejudiced Posey both individually and cumulatively. *Cf. Hooks*, 689 F.3d 1148, at 1205-1207 (finding cumulative *Strickland* prejudice based on counsel's failure to respond to prosecution's case in aggravation, and failure to present evidence of family and social dysfunction and mental health impairment).

### E.    Prior Counsel Ineffectively Omitted These Ineffectiveness Grounds.

Posey's appellate and post-conviction counsel omitted all ineffectiveness grounds above except for the direct appeal claim that trial counsel failed to present a trauma expert in Stage 2. Direct appeal counsel was charged with raising trial counsel's ineffectiveness. *Evitts v. Lucey*, 469 U.S. 387, 397-98 (1985). Claims regarding the effectiveness of appellate counsel are governed by *Strickland* as well. *Smith v. Robbins,* 528 U.S. 259, 285 (2000). In accordance with *Strickland,* a petitioner alleging appellate counsel ineffectiveness must show: (1) that appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. *Id*. at 285–86. Counsel's failure to fully develop and present meritorious claims of trial counsel's ineffectiveness rendered them ineffective. *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003); *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

## VI.    THE STATE'S USE OF A VISIBLE SHOCK COLLAR ON POSEY VIOLATED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS.[35]

The trial court required Posey to wear a shock collar for his entire trial. Trial counsel objected to the collar on the first day of voir dire before jury selection began. Dkt. 19-4 at 3. Initially, the collar, which was around Posey's ankle, became exposed whenever he sat down and his pants legs rose. *Id.* at 4. The table arrangement in the courtroom made Posey's legs under the table visible from the jury box. *Id.* The judge agreed that the collar was visible: "Let me see. . . [O]h, yeah, right there I can." *Id.*

Trial counsel requested that draping be placed in front of both parties' tables to cover Posey's legs, but the courtroom deputy was unable to find skirts for the tables. *Id.* at 5-6. Instead, the solution was to raise the shock collar from Posey's ankle to right below his knee. *Id.* at 23. The deputy acknowledged that it was "not real tight" but believed it was tight enough not to slide down when Posey sat. *Id.* at 24.

### A.    Legal Standard

The Supreme Court has long recognized that the practice of requiring a defendant to appear before a jury in prison garb or shackles "pose[s] [] a threat to the 'fairness of the factfinding process'" and is "inherently prejudicial[.]" *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986). "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Estelle v. Williams*, 425 U.S. 501, 568 (1976). The practice is counter to the principle that "one accused of a crime is entitled to

---

[35]  Posey will be returning to state court to exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, [or] continued custody. . ..." *Flynn*, 475 U.S. at 567 (internal quotation marks omitted).

Thus, "the Constitution forbids the use of visible shackles during [the guilt and penalty phases of a capital trial] *unless* that use is 'justified by an essential state interest' . . . specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005). A case-by-case determination of whether such restraints are justified must be made before visible shackles are used; for example, a court may find that there was "a risk of escape" or "a threat to courtroom security." *Id.* at 635. The Court has made clear, however, that a case with "indisputably good reasons for shackling" would be an "exceptional" one. *Id.* "[W]here a court, without adequate justification, orders the defendant to wear [visible] shackles . . ., the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. Instead, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] did not contribute to the verdict obtained.'" *Id.*

### B.    The Use of a Visible Shock Collar Was Unconstitutional.

This was not a case with "indisputably good reasons for shackling." *Deck*, 544 U.S. at 635. Here, Posey was required to wear a visible shock collar without *any* finding that the collar was justified by an essential state interest. The State could not cite a single instance at a prior proceeding in which Posey had threatened courtroom security. *See* ECF 19-4 at 4-5. The State offered that shock collars were "a pretty common thing that's utilized for in-custody defendants in this courthouse and other courthouses across the state." *Id.* at 6. But that argument is unavailing—the "essential state interest" must be "specific to the defendant

85

on trial," not just some general concern. *Deck*, 544 U.S. at 626; *id.* at 632 ("[G]iven their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case."). Simply, "courts cannot routinely place defendants in shackles. . . [Rather, they can do so only after making a] case specific [determination that] . . . reflect[s] particular concerns . . . related to the defendant on trial." *Id.* at 633.

As in *Deck*, *id.* at 634-35, the record here contains no formal or informal findings that there was a risk Posey would escape or threaten courtroom security. The court instead relied on the fact that Posey had previously been handcuffed and shackled at pre-trial hearings. Dkt. 19-4 at 6. But the fact that he had been previously handcuffed says nothing about whether there was a need for restraints either at those past proceedings or going forward. The judge did not refer to any safety concern or indicate that Posey posed a danger to anyone in the courtroom. *Accord United States. v. Banegas*, 600 F.3d 342, 346 (5th Cir. 2010) (rejecting general justification for shackling).

When visible restraints are used without particularized justification, prejudice is presumed. *Id.* at 347 (holding that when the district court does not adequately articulate individualized reasons for shackling, and there is a question whether shackles were visible to jury, the government bears the burden of proving beyond a reasonable doubt that the leg irons could not be seen by the jury as part of burden to show, beyond a reasonable doubt, that shackles did not contribute to verdict). Moreover, if there is a question whether the restraints were visible to the jury, the burden, under *Deck*, falls on the government to show they were not. *Id.* (explaining that the *Deck* court noted that the record is often devoid of

86

any discussion of shackling, and it would be perverse to require a defendant to prove, on a sparse record, that the restraints were visible before the government would be required to prove the absence of prejudice). Thus, in *Banegas*, the Fifth Circuit assumed that appellant's leg shackles were visible even though the trial judge stated that she could not see the shackles and "'it would be very difficult for them [the jury] to see them, and I think we have kept them from view as best as possible.'" 600 F.3d at 345; *id.* at 346 (noting that it was not "ineluctably clear" from the record that the restraints were *not* visible).

The use of a visible shock collar compromised the fact-finding process in violation of Posey's Sixth and Fourteenth Amendments rights in the absence of any case-specific determination justifying its use. *Deck*, 544 U.S. at 635. For the reasons above, Posey is entitled to relief from his conviction and sentence.

## VII. THE TRIAL COURT'S REFUSAL TO PERMIT POSEY THE OPPORTUNITY TO PRESENT TESTIMONY CRITICAL TO HIS DEFENSE VIOLATED HIS RIGHTS TO DUE PROCESS OF LAW, TO A FAIR TRIAL AND RELIABLE SENTENCING PROCEEDING, AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL.[36]

### A.    Legal Argument.

The trial court's refusal to permit Posey to fully present a complete defense violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, to a fair trial and reliable sentencing proceeding, and to the effective assistance of counsel.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [410 U.S. 284 (1973)] or in the Compulsory Process or

---

[36] Posey will be returning to state court to exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

Confrontation clauses of the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23 . . . (1967); *Davis v. Alaska*, 415 U.S. 308 . . . (1974), the Constitution guarantees criminal defendants "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Though "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials . . . [t]his latitude . . . has limits." *Holmes v. South Carolina*, 547 U.S. 319 (2006) (cleaned up).

In addition to providing the right to compulsory process, the Sixth Amendment also provides a right to effective assistance of counsel. *See supra*, Ground V. Under *Strickland*, 466 U.S. at 686, the "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." "The right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments." *Herring v. New York*, 422 U.S. 853, 857-58 (1975) (finding New York denied defendant Sixth Amendment right to assistance of counsel where statute granted judges the power to deny closing argument); *see also Geders v. United States*, 425 U.S. 80, 91 (1976) (finding trial court's order preventing defendant from consulting counsel during overnight recess between his direct and cross examination deprived petitioner of Sixth Amendment right to assistance of counsel). No showing of prejudice is required where state interference prevents counsel from performing effectively. *United States v. Cronic*, 466 U.S. 648, 658-59 & n.24 (1984).

**B.    The Trial Court Impermissibly Excluded Third-Party Perpetrator Evidence.**

**1.    The Trial Court Impermissibly Excluded Evidence Impeaching Ms. Gibbins' Ex-Boyfriend Brady Almaguer.**

Trial counsel spent over a fifth of their opening argument, Dkt.19-7 at 37-56, discussing prime suspect Brady Almaguer: his abuse of Ms. Gibbins during their relationship and his threatening behavior after, including threatening to burn Ms. Gibbins' house down with her and her son in it, *id*. at 51-52; the extensive interactions between Almaguer and Ms. Gibbins the day before the fire, including over seventy text messages, *id*. at 52; the eyewitness testimony placing a vehicle matching Almaguer's at Ms. Gibbins' home the night of the fire, *id*. at 52-53; his lack of any real alibi for the time of the fire, *id*. at 53; and his lack of emotion and unwelcome reception by Ms. Gibbins' family at the fire scene, *id*., before concluding that the State's "evidence will show Derek Posey didn't do it." *Id*. at 55. As trial counsel also mentioned in opening argument, Ms. Gibbins' family shared this history and their suspicions with law enforcement, who nonetheless failed to search Almaguer's home or vehicle, to obtain the text messages from his cell phone, or to question him more than once. Dkt.19-7 at 53-55; *see also* Dkt.19-13 at 67 (Almaguer testifying that police had not asked to look at his cell phone or text messages). No messages were recovered from Ms. Gibbins' phone, as law enforcement never found it. Dkt.19-7 at 54.

Proceeding with such crucial stones left unturned by the State, trial counsel attempted to paint Almaguer as the third-party perpetrator with what limited means they had, obtaining mixed results. *See*, *e.g.*, Dkt.19-9 at 239 (Ms. Gibbins' sister testifying on cross-examination that Ms. Gibbins had shown her text messages in which Almaguer wished Ms. Gibbins' son

89

and son's father would die in a car wreck); Dkt.19-13 at 98, 101-103 (State alibi witness testifying that, a few weeks before the fire, Almaguer had told her, "he would burn [Ms. Gibbins'] house down with everyone in it," before going on to deny Almaguer would have been capable of the crime and diminishing the "flippant" statement as a bad coincidence); *id*. at 184-94, 193 (Ms. Gibbins' best friend, a recalled State's witness, [37] briefly testifying to her by-then-faded recollection of text messages from Almaguer to Ms. Gibbins saying he wished her son and son's father would die, which on cross-examination she agreed was "not a big event."); *id*. at 194-206 (mother of Almaguer's child briefly testifying to Facebook messages in which Ms. Gibbins told McGee that Ms. Gibbins was afraid of Almaguer and McGee responded advising a protective order [38]).

Almaguer categorically denied he had ever threatened Ms. Gibbins, Dkt.19-13 at 27, and painted their in-person and electronic interaction as peaceful. *Id*. at 30-33. He offered the same denials on cross-examination, dismissing accounts of threats as "hearsay."  *Id*. at 47. Pointing out the lack of physical proof to counter him, *id*. at 86, he again denied he had ever threatened Ms. Gibbins, *id*. at 41; denied sending text messages that he wished Ms. Gibbins, her son, and her son's father would die or saying that he would burn Ms. Gibbins' house down, *id*. at 56; and denied that discord between him and Ms. Gibbins had ever

---

[37] Trial counsel had wanted to bring the subject out on cross-examination, but the trial court sustained the State's objection to such questioning as outside the scope. Dkt.19-11 at 93. The jury thus only heard of this information in the context of two witnesses whose testimony together spanned a little over twenty transcript pages, at the end of a 21-day guilt phase.

[38] The State convinced the trial court to narrow even this witness' testimony, with the court keeping out McGee's testimony that Ms. Gibbins had also messaged her that Almaguer was repeatedly driving by her home. *Id*. at 196-99.

necessitated law enforcement involvement. *Id*. at 68-69.

One piece of incontrovertible evidence could have broken through the faded memories and differing accounts: testimony and police reports from officers called, contrary to Almaguer's testimony, in response to discord between the two. *See* Docs. 19-13 at 757-63, 20-13 at 121-26 (proffered evidence). This evidence would have portrayed a very different picture of Almaguer and Ms. Gibbins' relationship in the months between their break-up and the fire than the one he offered.

However, the trial court sustained the State's objection to extrinsic impeachment evidence, per State code and case law. *Id*. at 737-41, 745, 757. The State further quoted *Chambers*' dicta, "In the exercise of his right to present witnesses in his own defense, the accused as is required by the state, must comply with the established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence," to claim the case stood for the opposite of its holding. *See* Dkt.19-3 at 747 (quoting *Chambers*, 410 U.S. at 302). But, the next line of *Chambers* goes on to explain, "Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed." 410 U.S. at 302. And that paragraph concludes, "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice," *id*., as trial counsel quoted. Dkt.19-13 at 751.

Mechanistic application of evidentiary rules as trumping constitutional rights is

exactly what happened, as illustrated by the gulf between the state precedent the State and trial court relied on, *id*. at 738-41, and the circumstances here. In *Jones v. State*, 781 P.2d 326, 330 (Okla. Crim. App. 1989), OCCA found the trial court had erred, according to 12 O.S. 1981, § 2608(B), by allowing the *State*[39] to impeach with extrinsic evidence the defendant, on trial for lewd molestation of a minor, for testifying he had never hit his wife. Both *Jones*, and the evidence code, involve cross-examination on the witness' credibility or truthfulness. But this extrinsic evidence would not have probed Almaguer's general truthfulness or credibility by exposing his lie about an unrelated incident—it would have bolstered Posey's defense theory that Almaguer was the actual perpetrator. Almaguer's testimony, with its rosy portrayal of where he and Ms. Gibbins stood, left the jury to believe he had no motive, reason, or basis to kill his "friend," Dkt.19-13 at 47, that he "texted about everything" and "talked to every single day," *id*. at 32, and who would "invite[] [him] over." *Id*. at 61. Trial counsel further altered and weakened their strategy in response to the exclusion, deciding not to call Almaguer to the stand for their own case in chief. *See* Docs. 19-13 at 89, 19-14 at 31.

Both *Chambers*, 410 U.S. at 289-94, 303, and *Holmes*, 547 U.S. at 327-31, examined, and reversed, state court holdings where trial courts had excluded evidence supporting a third-party perpetrator defense, demonstrating the particular importance this kind of evidence must be afforded. Indeed, the trial court, over State objection, allowed the defense

---

[39] This distinction also separates *Jones* from the case at hand: even if an evidentiary error had arisen from the trial court admitting Posey's extrinsic evidence, the *State* did not have a due process right at stake.

to present Almaguer as a third-party perpetrator. Docs. 19-2 at 506-507; 20-2 at 1377-86. But the court then unconstitutionally limited and rendered toothless this key defense theory. *See also Rock v. Arkansas*, 482 U.S. 44, 55 (1987) ("Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony.") Here, the exclusion, resting upon an inapposite case, was arbitrary.

> ### 2. The Trial Court Impermissibly Excluded All Evidence of Other Third-Party Perpetrators.

Exacerbating this arbitrary exclusion of incontrovertible evidence impeaching Almaguer, the trial court excluded altogether evidence of other witnesses as the perpetrators of the fire. This exclusion also rested on the state evidentiary rules being "applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302.

Anita Gibbins, Ms. Gibbins' landlord, former mother-in-law, and neighbor, *see* Dkt.19-7 at 123-26, noted that after being awoken by a loud crash the night of the fire, she looked out her window and saw "four boys" she did not recognize walking "single file by the house." *Id*. at 133-34. Several young men then testified to finding themselves around Ms. Gibbins' home that night. *See id*. at 307-13 (Jesse Smith testifying to parking at his friend Grant Hedrick's home at 4:30 A.M., seeing smoke nearby, and walking the couple of blocks to Ms. Gibbins' home, where they saw the fire and three other young men arriving in a car), 393-400 (Michael Aldrich testifying he was at his friend Francisco Martinez's house, saw smoke, walked over to the fire department near Ms. Gibbins' home, and called

911), 422-46 (Hedrick testifying to arriving at the scene with Smith, three other young men arriving by foot after, calling 911, and knocking on various doors for help), 477-86 (Martinez testifying he, Aldrich, and Ray Doyah were in Martinez's backyard, saw smoke, ran down the road, and called 911), 506-20 (Doyah testifying he was outside smoking a cigarette when Martinez and Aldrich ran up and said they saw a fire before all three ran over to the area of Ms. Gibbins' home and the fire station). The responding police officer further testified denying that the young men were acting suspiciously. *Id*. at 289-90.

Posey's jury never learned that there was reason the witnesses would be suspicious. The State had asked that the trial court preclude Posey from presenting a defense that some of these witnesses had actually been the ones to set the fire, relatedly also requesting that the trial court exclude that Martinez and Aldrich had recently pled guilty to possessing an incendiary device, with Martinez still on probation at the time of the fire, and exclude the term "Molotov cocktail." Dkt. 19-2 at 441-52; Dkt. 20-2 at 1387-88, Dkt. 20-3 at 18-27. The trial court excluded use of "Molotov cocktail," and excluded any reference to Aldrich's misdemeanor adjudication, as well as any reference to the underlying offense in Martinez's felony adjudication, under state statute. Dkt.19-2 at 478-81.

After an ex parte discussion of the defense third-party perpetrator evidence, *id*. at 488-503, the trial court agreed with the State that the defense had not shown the required quantum of evidence to present the witnesses as third-party perpetrators. *Id*. at 503-506. Trial counsel repeatedly requested the trial court reconsider and made offers of proof throughout the trial. *See*, *e.g.*, Docs. 19-7 at 293-95, 418-19, 502-503; 19-9 at 90-91. The effects of this exclusion reverberated across defense strategy, including preventing counsel

from asking the State fire experts about Molotov cocktails, Dkt.19-13 at 718-722, and from

calling Martinez and Aldrich as witnesses altogether due to the exclusion. Dkt.19-14 at 30.

## C.    The Trial Court Impermissibly Prohibited the Defense from Showing That the State's Fire Origin Theory was Scientifically Unreliable.

During trial, the State moved orally to preclude the defense from showing the jury

multiple videos during the testimony of its fire investigation expert Douglas Carpenter

containing experiments disproving the State's theory of the fire origin at the Gibbins home.

Dkt. 19-11 at 595-596. As the defense explained, the videos are "critical evidence . . . to

answer questions about the State's case." Dkt. 19-11 at 616. In total, the videos were about

10 to 15 minutes long. Dkt. 19-11 at 613, 622.

The State conceded that showing the videos to the jury "do[es] or could prejudice

the State's theory of the case. It is clearly a direct attempt at contradicting [fire investigation

expert] Magalassi's theory and origin hypothesis. It is clearly meant to be undermining to

the testing done by the ATF at the fire research lab." Dkt. 19-11 at 613. Posey proposed that

the State be given any continuance needed to address the videos with State experts rather

than deny Posey's fair trial rights by precluding admission. Dkt. 19-11 at 616. The court

precluded the videos. Dkt. 19-11 at 630. Particularly as there was an available remedy, any

prejudice to the State was eliminated and only Posey was left harmed.

All told, Posey was denied his right to present a complete defense because the trial

court excluded critical evidence implicating "constitutional rights directly affecting the

ascertainment of guilt." *Chambers*, 410 U.S. at 302. The trial court did so in multiple

instances by impermissibly applying state evidentiary rules "mechanistically to defeat the

ends of justice." *Chambers*, 410 U.S. at 302. The court's rulings on crucial third-party perpetrator evidence implicitly shifted the burden of proof from the State to Posey, as trial counsel argued. *See* Dkt. 19-13 at 139-41; *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). For the jury to acquit Posey, it needed only have reasonable doubt about the State's case. And the defense guilt-phase strategy relied on calling into question whether Posey was the perpetrator. Doing so effectively—without mechanistic application of evidentiary rules or interference with the right to effective assistance of counsel—could have created reasonable doubt in the mind of a juror.

Further, the prejudice resulting from the exclusion of this testimony bled into the sentencing stage. Had counsel been allowed to present the excluded evidence supporting the culpability of third-party perpetrators rather than Posey, there is a reasonable probability this evidence would have created residual doubt. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting "residual doubts" by a jury during guilt phase are effective grounds for argument in capital-sentencing phase). Residual doubt is a powerful factor influencing juries to vote for less than death. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (Oct. 1998). This evidence would have also undermined the aggravators.

## VIII. THE DISPLAY OF VICTIMS' BUTTONS BY SPECTATORS IN THE COURTROOM VIOLATED POSEY'S CONSTITUTIONAL RIGHTS. [40]

### A.  Legal Standard

A person accused of a crime "is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). The Supreme Court has recognized that certain courtroom practices that expose the jury to improper influence outside of the evidence "are so inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006) (citing *Estelle v. Williams*, 425 U.S. 501, 503-06 (1976), and *Flynn*, 475 U.S. at 568 (1986)). "Whenever a courtroom arrangement is challenged as inherently prejudicial, [] the question must not be whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play[.]" *Flynn*, 475 U.S. at 570 (quoting *Williams*, 425 U.S. at 505).

### B.  The Presence of Spectators Wearing Buttons in the Courtroom at Trial Displaying the Victims' Images Violated Posey's Constitutional Rights.

Oklahoma law provides that certain members of a murder victims' family may wear buttons with a picture of the victim as a symbol of grief during trial. 21 O.S. § 142A-10. Trial counsel filed a motion in limine to exclude the grief buttons, arguing that the photos were not relevant to any issue in the trial, were prejudicial, violated Posey's due process rights, invited the jury to make arbitrary decisions in a death penalty case in violation of the Eighth Amendment, and impeded on the presumption of innocence. Dkt. 20-1 at 554-56,

---

[40] Posey will be returning to state court to exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

562. The State opposed the motion, "advis[ing] the Court" that Oklahoma law "requires courts to permit members of the immediate family of a murder victim to wear small buttons containing a picture of the victim as a symbol of grief in a trial." Dkt. 20-1 at 997. The court denied the defense motion. Dkt. 19-1 at 8-9.

At a hearing before the jury was sworn in and testimony began, trial counsel renewed their objection to the victims' family wearing grief buttons. Counsel noted that "the victims' family and the jurors were outside [the courtroom] mingling together [and "sitting in close proximity to one another"]—I understand the victims' family has been sent downstairs. However, Judge, they're wearing buttons." Dkt. 19-7 at 6, 9. The court acknowledged that the victims' family was not moved downstairs until "that came to [the court's attention] and to the State's attention." *Id.* at 10. Counsel for the State responded that the buttons are "a small square" that the family is "allowed to wear," *id.*, at 7-8, further showing the State's sanctioning of the process. The trial court overruled the objection but entered the following copy of the button into the record as a court exhibit at the defense's request:



*Id.* at 8-9, 280.[41]

---

[41] This is an exact copy of what was admitted as Court Exhibit 1 at trial, *see* Dkt. 19-7 at 10, 281, though it is clearly incomplete as it does not contain Bryor's full name but is cut off after "Bry" so the original buttons must have been larger than the exhibit. The actual

Not only did jurors see the victims' pictures on buttons while mingling with the victims' family outside the courtroom, but also the jury was exposed to numerous spectators wearing the buttons inside the courtroom each day throughout the duration of the 20-day trial as well as the six-day penalty hearing. *See* Solomon Aff., ¶11. In this case, the display of the victims' buttons, sanctioned by the state pursuant to 21 O.S. § 142A-10, was inherently prejudicial. As Justice Souter noted in his concurrence in *Musladin*: "One [cannot] seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations." 549 U.S. at 82 (Souter, J., concurring); *see also Flynn*, 475 U.S. at 570. "The display is no part of the evidence going to guilt or innocence." *Id.* at 82-83 (Souter, J., concurring). Instead, "the buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and a call for some response from those who see them." *Id.* at 83. The response expected from jurors is to convict, and "a sympathetic urge to assuage the grief or rage of survivors with a conviction would be the *paradigm of improper consideration*." *Id.* (emphasis added); *see also id.* at 80 ("Trials must be free from a coercive or intimidating atmosphere.") (Kennedy, J., concurring).

While the Supreme Court in *Musladin* reversed the Ninth Circuit's grant of relief, *Musladin* does not prevent this Court from granting relief here. The *Musladin* court found that *Williams* and *Flynn*, which concerned state-sponsored practices, did not provide clearly established federal law regarding grief buttons where their display involved purely private

---

size of the button is unknown as it is not in the record, but the Oklahoma statute states that "[t]he button shall not exceed four (4) inches in diameter." 21 O.S. § 142A-10.

spectator conduct. *Id.* at 75-77. In *Musladin*, there was no indication in the record that the State had any involvement in the display of the buttons. But here, Oklahoma law explicitly sanctions the display of grief buttons. 21 O.S. § 142A-10. And when state law conflicts with the federal constitution, the latter controls pursuant to the Supremacy Clause. Art. VI, cl.2; *cf. Am. Trucking Associations, Inc. v. City of Los Angeles, Cal*., 569 U.S. 641, 656 (2013) (Thomas, J., concurring) ("Because the Constitution and federal laws are supreme, conflicting state laws are without legal effect."). The state-sanctioned display of grief buttons presents an unacceptable risk of impermissible factors coming into play. Their logical purpose is to evoke sympathy and urge jurors to convict and/or sentence a defendant to death to "assuage the grief or rage of survivors." *Musladin*, 475 U.S. at 83. Their use here cannot be reconciled with Posey's Sixth, Eighth, and Fourteenth Amendments rights.

## **CONCLUSION**

Derek Posey respectfully requests this Court issue the Writ of Habeas Corpus.

Respectfully submitted,

*s/ Hunter Labovitz*
HUNTER LABOVITZ, NJ BAR #010942006
BRENDAN VAN WINKLE, SC BAR #104768
Assistant Federal Public Defenders
Federal Public Defender's Office
Western District of Oklahoma
215 Dean A. McGee, Suite 707
Oklahoma City, OK   73102
Telephone: (405) 609-5975
Facsimile: (405) 609-5976
Hunter_Labovitz@fd.org
Brendan_VanWinkle@fd.org

COUNSEL FOR PETITIONER,
DEREK DON POSEY

## <u>CERTIFICATE OF SERVICE</u>

I, Hunter Labovitz, hereby certify that on the 26th day of January 2026, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christina Burns, Assistant Attorney General
Jennifer Crabb, Assistant Attorney General
Joshua Lockett, Assistant Attorney General

State of Oklahoma Attorney General's Office

Additionally, a copy of the foregoing document will be emailed to the following service email of the Oklahoma Attorney General's Office:

fhc.docket@oag.ok.gov

*s/ Hunter Labovitz*
HUNTER LABOVITZ
Assistant Federal Public Defender

101